829 F.2d 1308
 41 Ed. Law Rep. 1218
 The SCHOOL BOARD OF THE CITY OF RICHMOND, VIRGINIA; Lois
Harrison-Jones, Dr., in her official capacity as
Superintendent of Richmond Public Schools; Leroy R.
Hassell; Melvin D. Law; Meda S. Lane; Reginald L. Brown;
Elizabeth T. Bebbs; Roger K. Clark; William R. Johnson, in
their official capacities as school board members,
Plaintiffs-Appellants,
and
Carolyn Bradley; Micheal Bradley, infants, by Minerva
Bradley, their mother and next friend, et al; Shawn
Coleman, a minor, by his mother and next friend; Alice M.
Coleman; Antwaine Hill, a minor, by his mother and next
friend, Loretta Hill, Plaintiffs,
v.
Gerald L. BALILES, Governor of the Commonwealth of Virginia;
H.W. Tulloch; Kenneth S. White, Members of the State Board
of Education; S. John Davis, Dr., Superintendent of Public
Instruction of the Commonwealth of Virginia; Donald J.
Finley, in his official capacity as Secretary of Education
of the Commonwealth of Virginia; the State Board of
Education of the Commonwealth of Virginia, and its
individual members, in their official capacities as state
board members; Mark Fravel, Jr.; Robert H. Defort, Jr.;
Allix B. James; W.L. Lemmon; Frances A. Lewis; Margaret
S. Martson; Suzanne F. Thomas, Defendants-Appellees,
and
City Council of the City of Richmond; City of Richmond,
Virginia, Defendants.
 No. 86-3106.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 9, 1987.
Decided Sept. 29, 1987.
 
 Elliot M. Mincberg (David S. Tatel, Steven J. Routh, Hogan & Hartson, Washington, D.C., on brief), for plaintiffs-appellants.
 Gregory E. Lucyk, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., Paul J. Forch, Sr. Asst. Atty. Gen., William L. Thurston, Asst. Atty. Gen., Richmond, Va., on brief), for defendants-appellees.
 Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.
 DONALD RUSSELL, Circuit Judge.
 
 
 1
 This case concerns long-standing efforts to desegregate the public schools in Richmond, Virginia. Litigation began in 1961 when a class of individual plaintiffs brought suit against the School Board of the City of Richmond ("School Board"). The court initially ordered a freedom-of-choice plan for student attendance, but this proved to be ineffective. In 1970, following several intermediate suits, the court ordered the School Board to begin reassigning students and faculty. Bradley v. School Board, 317 F.Supp. 555 (E.D.Va.1970). The court retained jurisdiction to monitor the desegregation plan and to order additional relief if necessary. Bradley v. School Board, 325 F.Supp. 828 (E.D.Va.1971).
 
 
 2
 After the court's 1970 decision, the individual plaintiffs and the School Board joined as additional defendants two neighboring county school boards, members of the state board of education, and the state superintendent of public instruction. Bradley v. School Board, 51 F.R.D. 139 (E.D.Va.1970). The district court found that both the county and state defendants had committed constitutional violations that contributed to Richmond's segregated education system, and ordered interdistrict consolidation of the Richmond Public Schools ("RPS") and the schools in the neighboring counties. Bradley v. School Board, 338 F.Supp. 67 (E.D.Va.1972). On appeal we reversed the remedy, holding that there was insufficient evidence of an interdistrict constitutional violation by the counties. Bradley v. School Board, 462 F.2d 1058 (4th Cir.1972) (en banc), aff'd by an equally divided Court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973) (per curiam). We did not disturb the finding of state liability, however, agreeing that "within the city of Richmond there has been state ... action tending to perpetuate apartheid of the races...." Id. at 1065.
 
 
 3
 Following our 1972 decision, the School Board began implementing the court-ordered intradistrict desegregation plan. The district court retained jurisdiction over this plan and approved fifteen plan modifications between 1972 and 1979. In March 1984 the School Board successfully moved to be realigned as a plaintiff and to rejoin as defendants the state defendants and the governor of Virginia in their official capacities. The School Board alleged that the state defendants had not fulfilled their constitutional obligation to eradicate the vestiges of segregation in RPS. As a remedy, the Board sought to compel the state to fund remedial and compensatory programs to eliminate the lingering effects of the state's former dual system. The individual plaintiffs filed an amended complaint seeking a similar remedy. The court denied the requested relief, Bradley v. Baliles, 639 F.Supp. 680 (E.D.Va.1986), and the School Board now appeals. We affirm.
 
 I. Standing
 
 4
 Because the individual plaintiffs have chosen not to pursue this appeal, we are presented first with the question of whether the School Board on its own has standing to appeal the court's judgment. The state defendants contend that Richmond's black students are the only "real party in interest" in this litigation, and that the individual plaintiffs' decision to "abandon" this litigation by not appealing the district court's judgment removes any element of case or controversy between the state defendants and the real party in interest. See Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 1704, 90 L.Ed.2d 48 (1986).
 
 
 5
 We reject this contention on which we implicitly ruled earlier in this proceeding some fifteen years ago and found derivative standing. At that time we chose not to disturb the district court's holding that the School Board had standing to bring claims against the state defendants "on behalf of the white and black students" of Richmond. Bradley v. School Board, 338 F.Supp. 67, 229 (E.D.Va.), rev'd on other grounds, 462 F.2d 1058 (4th Cir.1972) (en banc), aff'd by an equally divided Court, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973) (per curiam). Having previously accorded the School Board standing to sue on behalf of the students, we find no reason to rule otherwise now.
 
 
 6
 It would also appear that the School Board has standing to appeal on its own behalf because it alleges that the state defendants' failure to discharge their affirmative obligation to eliminate the vestiges of state-imposed segregation has impeded the School Board's ability to carry out its own constitutional duty to redress the effects of segregation in RPS. See Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).
 
 
 7
 Finally, the School Board asserts it has standing because of the direct economic injury it has suffered as a result of the state defendants' unconstitutional conduct. That conduct allegedly has saddled the School Board with a school system whose high concentration of disadvantaged minority students requires large expenditures for compensatory education and other education services. We have recently ruled that a plaintiff has standing to pursue claims that state action has caused or threatens to cause such economic injury. See American Booksellers Association v. Virginia, 792 F.2d 1261, 1263 (4th Cir.1986).
 
 
 8
 We hold that on any of these grounds the School Board has standing to pursue this appeal even though the individual plaintiffs have chosen to accept the court's judgment.
 
 II. Burden of Proof
 
 9
 Turning to the merits of the case, the School Board contends that the district court improperly shifted the burden of proof to the plaintiffs. It is well established that once a court has found an unlawful dual school system, the plaintiffs are entitled to the presumption that current disparities are causally related to prior segregation, and the burden of proving otherwise rests on the defendants. Dayton Board of Education v. Brinkman, 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (Dayton II ); Vaughns v. Board of Education, 758 F.2d 983, 991 (4th Cir.1985). This presumption ends once the school district has achieved unitary status. Riddick v. School Board, 784 F.2d 521 (4th Cir.1986).[1] In the present case the court found a number of reasons for placing the burden of proof on the plaintiffs. We affirm the ruling on the district court's finding that the RSB had at the time of this proceeding achieved a unitary system.
 
 A.
 
 10
 In Vaughns, supra, following a 1973 finding of an unlawful dual system, the plaintiffs claimed that the Prince George's County school system discriminated against black students in regard to enrollment in the county's special education and talented and gifted education programs. We reversed the trial court and ruled that it had impermissibly placed on the plaintiffs the burden of proving that the present disparities in student placement were causally related to pre-1973 segregation.
 
 
 11
 In the instant case the court suggested that our decision in Vaughns was limited to cases where the alleged disparity was in the area of student placement. We find nothing in Vaughns that supports such a narrow interpretation. Our decision there clearly states that in school desegregation cases the burden does not shift back to the plaintiffs until the school system achieves unitary status. Vaughns, 758 F.2d at 991; see Dayton II, supra; United States v. Gadsden County School District, 572 F.2d 1049, 1050 (5th Cir.1978). The allocation of the burden is not related to the nature of the educational disparity. We therefore reject the court's first theory for placing the burden of proof on the plaintiffs.
 
 B.
 
 12
 In reaching its determination that the RSB had achieved unitary status the court relied on the test enunciated in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Under the Green test, a school district has achieved unitary status when it is devoid of racial discrimination in regard to faculty, staff, transportation, extracurricular activities, facilities, and pupil assignment. Id. at 435, 88 S.Ct. at 1693. The School Board conceded at trial that there is no intentional discrimination in RPS in these six areas, nor is there intentional discrimination in analogous areas such as school board appointments, compensation, curriculum, or school location. It is clear that if the six factors in Green and their analogs are the only ones to be considered in determining whether a school system has achieved unitary status, the court was correct in declaring that RPS is now unitary and that the burden of proof rests on the plaintiffs.
 
 
 13
 The School Board contends, however, that these six factors are not exclusive. They suggest that we should also consider such nonanalogous factors as comparative dropout rates, graduation rates, and scores on standardized tests. Their reason for asking the court to consider these factors is related to the very large percentage of black students within RPS. The School Board contends that the kinds of factors included in Green can be appropriate indicia of unity only when the demographics of the school system permit integration. Because RPS was 86.4 percent black at the time of this suit, the School Board argues, there can be no meaningful integration. They therefore offer these other factors for use in determining whether the vestiges of discrimination are gone and the black students have been restored to the position they would have occupied if there had been no unlawful dual school system. See Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ).
 
 
 14
 We do not reject the possibility that in some circumstances it might be appropriate to use factors other than the kind described in Green--i.e., other than those relating to student body composition or school operations. In the present case, however, even if we were to accept the proposition that dropout rates, graduation rates, and scores on standardized tests are appropriate indicia of continuing racial discrimination, the facts do not support the School Board's position. Despite its large percentage of blacks, RPS performs nearly as well as the state as a whole. The achievement scores on standardized tests, for example, show that RPS has progressively improved the relative performance of its students. For standardized reading tests, fourth-grade students in RPS now rank above the 50th percentile on a national scale, and rank only slightly lower than the statewide average.[2] This is a potent indicator that efforts to eliminate the effects of segregation have been successful.
 
 
 15
 As for disparities in the other comparative rates, these have decreased for RPS in recent years at the same time that the percentage of black students in RPS was increasing. Between 1980 and 1983 the dropout rate fell from 12 percent to 7.5 percent; at the same time the percentage of black students in RPS rose from 84.4 percent to 86 percent. Between 1977 and 1983 the retention rate fell from 13.5 percent to 11.5 percent; at the same time the percentage of black students in RPS rose from 81.7 percent to 86 percent. There has also been an increase in graduation rates during the time that the percentage of black students in RPS increased. These statistics show that in comparing RPS against the state as a whole, there is no positive correlation between performance and racial composition.
 
 
 16
 To the extent that students in RPS still fall below the state averages in any of these areas, we are constrained by the court's factual finding that these deficiencies are primarily attributable to the high incidence of poverty in RPS and to the ineffective educational philosophy that was followed for some time in the district. In reaching this conclusion we are mindful that factual findings of the district court in school desegregation cases are entitled to great deference on review when the presiding judicial officer has lived with the case for many years. Vaughns, 758 F.2d at 990. We hold, therefore, that even if it could be said that the court erred in limiting its consideration to the six factors enumerated in Green, there was no reversible error in its conclusion that RPS has now achieved unitary status.
 
 
 17
 The court also assigned as a reason for placing the burden of proof on the plaintiffs in this case the long time that elapsed between the last finding of state liability and the present suit. See Oliver v. Kalamazoo Board of Education, 640 F.2d 782 (6th Cir.1980). This theory assumes that even absent a finding of unity, attenuation dissolves the presumption that present disparities are causally related to past segregation. Because we find that the burden was properly placed on the RSB because the RSB had achieved unitary status, we do not need to decide whether the passage of time (which, under the district court's finding, is from 1972 to the date of this proceeding), may be sufficient to dissolve the presumption. The same reasoning applies to the other additional reasons assigned by the district court for its ruling.
 
 III. Vestiges of Segregation
 
 18
 Having determined that the burden of proof properly shifted back to the plaintiffs because RPS is now a unified school system, we can examine the vestiges of segregation that allegedly remain. The School Board contends that these vestiges consist of racial isolation and educational deprivation.
 
 
 19
 Indisputably, the schools in RPS are racially isolated. Black students made up 86.4 percent of the student body in 1984, and in many schools the percentage of black students exceeds 90 percent. The School Board seeks funding from the state for remedial and compensatory programs that will help students in RPS overcome the injuries they suffer by virtue of being in these racially isolated schools.
 
 
 20
 The court concluded that the School Board failed to prove that this racial isolation was the result of state action, and we find no error in this decision. The argument that the failure of the State to refuse accreditation to the private schools operating in Richmond "without considering whether such schools maintained discriminatory admission practices or were being used as a haven for those persons seeking to avoid desegregation" and its selecting as the state-supported "model school" the Varina High School rather than a high school in RPS represented state action reinforcing and perpetuating segregation in the RPS system is effectively answered by the district court. We emphasize in this connection that the district judge has presided over this litigation for many, many years and has always exhibited great sensitivity to the rights of minority students. Given his intimacy with this case, with the racial dynamics within the City of Richmond and his demonstrated sensitivity to the rights of the minority students, we give his findings and conclusion great deference.
 
 
 21
 As for educational deprivation, the School Board primarily contends that because the parents of many current RPS students were educated in segregated schools, these parents have difficulty providing education-related support to their children. As we stated supra, the record shows that RPS students have greatly improved their performance since the implementation of the desegregation plan. To the extent that disparities still exist between RPS and the state average, we find no error in the court's conclusion that these disparities were caused by the high incidence of poverty in RPS and the ineffective educational philosophy that was followed for some time in the district.[3]
 
 
 22
 The School Board protests that in reaching its decision the court improperly limited its inquiry to deficiencies that allegedly exist within RPS itself, and refused to consider the indirect effects that prior school segregation may have had no current RPS students. We find that this limitation was proper. A state-mandated dual school system admittedly infects society as a whole. It inflicts poverty and many other ills on the students who receive an inferior education, and its effects last at least through those students' lifetimes. But a school desegregation plan cannot remedy these general societal ills, even when they indirectly affect current students. As the Court stated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 22, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971), "One vehicle can carry only a limited amount of baggage." Educational deficiencies that result from problems such as poverty are best remedied by programs directed toward eliminating poverty, not by indirect solutions through school programs.
 
 IV. State Funding and Programs
 
 23
 Because we have found no vestiges of state-mandated segregation in RPS that are appropriately remediable by the state defendants in a school desegregation suit following a finding of unitary status, we affirm the court's refusal to order state funding of remedial and compensatory programs. We emphasize, as did the court below, that the programs for which state funding was sought are highly desirable and no doubt would greatly benefit the students in RPS. Our desire to see these programs implemented, however, is not a legal basis for ordering the state to make them possible through increased funding.
 
 
 24
 We also agree with the court below that the state has adequately discharged its constitutional obligation, based on the liability that we upheld in 1972. Because of RPS' high concentration of disadvantaged students, the amount of state funding to RPS each year exceeds the state average despite the fact that Richmond is a wealthy school district and thus is considered better able to raise revenue for schools than are many other districts. In addition, the state has consistently provided disproportionately large amounts of aid to RPS specifically for remedial education. Furthermore, the state has allocated disproportionately large amounts of federal funding to RPS. Although none of these funds were explicitly designated as being to eliminate the vestiges of past discrimination, their purpose generally was to eliminate the very deficiencies in educational performance that were caused by past discrimination.
 
 Summary
 
 25
 In conclusion, we agree with the district court that RPS is now a unitary system and that the burden of proof properly belonged on the plaintiffs. We further agree that the plaintiffs failed to meet their burden of proof, and that the state defendants have adequately discharged their constitutional obligation to eliminate the vestiges of state-mandated segregation in RPS. The decision of the district court is accordingly
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 Prior to this case there had never been a declaration that RPS achieved unitary status. We recognize that there is dictum in our 1972 opinion stating that this was a unitary system. That issue, however, was not properly before the appeals court in 1972 and, as explained by the district court in the instant litigation, the facts in 1972 might not have supported a finding that RPS had achieved unitary status at that time
 
 
 [2]
 The reading scores for RPS students in the fourth grade are in the 52nd percentile; fourth-grade students statewide are in the 57th percentile
 
 
 [3]
 The court properly emphasized the limited nature of its holding. Although the School Board failed to prove that vestiges of state-mandated segregation remain in RPS, this does not mean that RPS is unaffected by past or present discrimination by other individuals or governmental bodies. Bradley, 639 F.Supp. at 702. Similarly, the defendants in this suit are absolved from further liability only in regard to state-mandated segregation within RPS, and not in any other context. Id