**Teresa PLEASANT, a minor and Donna Pleasant, a minor, by their Guardian Ad Litem, Terry PLEASANT, Plaintiffs,**

v.

**STANLY COUNTY BOARD OF EDUCATION, Jimmy E. Martin, Superintendent, Stanly County Board of Education, in his official capacity and City of Albemarle Board of Education, J. Bryce Cummings, Superintendent, City of Albemarle Board of Education, in his official capacity, et al., Defendants.**

No. C-88-129-S.

United States District Court,
M.D. North Carolina,
Salisbury Division.

July 20, 1988.

Michael W. Taylor, Albemarle, N.C., for plaintiffs.

E.H. Morton, Albemarle, N.C., for Stanly County Bd. of Educ.

John Bahner, Albemarle, N.C., for Albemarle Bd. of Educ.

## MEMORANDUM OPINION

GORDON, Senior District Judge:

This matter is before the court on cross motions for summary judgment. The only issue is whether the Stanly County Board of Education's decision to deny Teresa and Donna Pleasant, both white students, a transfer from Badin Elementary School to East Albemarle School, when black students would be granted such a transfer, violates the Equal Protection Clause of the

Fourteenth Amendment. Finding that Stanly County Board of Education's transfer policy is a commendable measure to maintain racial balance without disproportionately or unduly burdening white students, the court grants defendants' summary judgment motion.

## BACKGROUND

As of some 25 years ago, Stanly County Board of Education ("SCBE") operated a longstanding system of racially segregated schools. Then, on the heels of *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the Civil Rights Act of 1964, SCBE adopted a "Freedom of Choice" plan in 1965 to govern pupil assignments. Early in 1968, however, the Department of Health, Education, and Welfare ("HEW") notified SCBE that a number of its schools did not comply with the desegregration requirements of Title VI of the Civil Rights Act of 1964. SCBE, in turn, closed West Badin Elementary, the last all-black school in the system.

In 1971, the Supreme Court established a "presumption of segregration against schools that are substantially disproportionate in their racial composition." *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In 1975, as a part of ongoing litigation against HEW to eliminate racial disproportionality in public schools ("the *Adams* litigation"), the Federal District Court for the District of Columbia listed Stanly County, as well as 125 other southern school districts, as operating one or more schools with a substantially disproportionate racial composition. *Adams v. Weinberger*, 391 F.Supp. 269 (D.D.C.1975) (First Supplemental Order arising from *Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.1973), affirmed at 480 F.2d 1159 (D.C.Cir.1973). The court classified these schools as substantially disproportionate "because at least a 20% disproportion existed between the percentage of local minority pupils in the schools and the percentage in the entire school district." 391 F.Supp. at 271. *See Singleton v. Jackson Municipal Separate School District, et al.*, 432 F.2d 927, 930 (5th Cir. 1970, *cert. den.*, 402 U.S. 944, 91 S.Ct. 1611, 29 L.Ed.2d 112 (1971). The court ordered HEW to take specified corrective measures against the listed school districts.

In July 1975, HEW notified SCBE that Badin Elementary School was racially disproportionate, and that transfers to Albemarle City Schools, a separate school system, had "significantly contributed to the present problem." HEW sought "assurance that this practice will be discontinued by the beginning of the 1975–76 school year." HEW also notified Albemarle City Schools that "the continued acceptance of these inter-district transfer students would be discriminatory and would constitute a violation of Title VI of the Civil Rights Act of 1964 and existing case law." At this stage, according to HEW, Badin Elementary School had "a minority student percentage of 40.98 percent (176/427) as compared with a district-wide minority composition of 12.56 percent (855/6806)."

In August 1975, SCBE rescinded 93 white student transfers from the Badin Attendance Area to Albemarle City Schools and reassigned the same students to Badin Elementary School. In September 1975, Stanly County revised the attendance line between Badin and New London Elementary Schools, resulting in a reassignment of 53 black students from Badin to New London. The various reassignments only marginally increased the distances of transporting the students to school. In total, Stanly County reassigned 146 students to comply with HEW's mandate of achieving an acceptable level of racial balance at Badin Elementary School.

From 1975 to the present, SCBE's policy has been to deny requests by white students to transfer out of Badin Elementary. Likewise, SCBE County has denied requests by black students to transfer into Badin Elementary. Stanly County has applied this transfer policy to maintain racial balance in the school system. To date, minorities constitute 24.32% of the students attending Badin Elementary, as compared

with a system-wide minority student average of 13.10%.

In December 1987, the Federal District Court for the District of Columbia dismissed the *Adams* litigation, concluding that the plaintiffs "lack standing to continue this litigation." *Adams v. Bennett*, 675 F.Supp. 668, 681 (D.D.C.1987).

## FACTS

The parties have stipulated to the following facts:

The minor plaintiffs appear in this action by their Guardian Ad Litem Terry Pleasant, their father.

The minor plaintiffs are of the white race and reside with their father within the city limits of the City of Albermarle in Stanly County, North Carolina.

Donna Pleasant is age 8 and is in the Second Grade and Teresa Pleasant is age 11 and is in the Fifth Grade in the East Albemarle School, which is operated by the City of Albemarle Board of Education.

SCBE operates a system of 11 elementary schools with a system-wide average of minority students of 13.10% of its 6700 students and with minorities composing the following percentages of the student bodies of the various elementary schools:

| | | |
|---|---|---|
| Aquadale | 16/284 | 6.06% |
| Badin | 127/522 | 24.32% |
| Endy | 2/310 | 0.64% |
| Locust | 5/378 | 1.32% |
| Millingport | 3/310 | 1.29% |
| New London | 145/664 | 21.83% |
| Norwood | 136/554 | 24.54% |
| Oakboro | 73/516 | 14.14% |
| Richfield | 31/309 | 10.03% |
| Ridgecrest | 3/215 | 1.39% |
| Stanfield | 10/365 | 2.73% |

The City of Albemarle has divided its jurisdiction into three elementary school districts with a system-wide minority percentage of 29% (548 out of 1911 students) and with minorities composing the following percentages of the student bodies of the various elementary schools:

| | | |
|---|---|---|
| East Albemarle | 102/295 | 35% |
| Central | 62/220 | 28% |
| North Albermarle | 98/317 | 31% |

All students transferring from the Stanly County Schools to the City of Albemarle Schools must be released by the Stanly County Schools and accepted by the Albemarle City Schools, and all such elementary school transfer students are assigned to East Albemarle Elementary School.

SCBE and the City of Albemarle Board of Education by action taken in August 1975 prohibit the transfer of white students from the Badin Elementary School District into the City of Albemarle schools although the Boards permit such transfers by black students.

Plaintiffs resided in the East Albemarle Elementary School district in the City of Albemarle at the beginning of the 1987–88 school year.

On January 23, 1988, plaintiffs moved approximately one-half mile north to a recently developed area which lies within the city limits of Albemarle but also within the Badin School District of the SCBE.

SCBE denied plaintiffs' request to transfer from Badin Elementary School to East Albemarle School.

In February 1988, plaintiffs filed this action contending that the denial of the requested transfer violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiff sought a preliminary injunction enabling them to remain at East Albemarle Elementary School. The court held a hearing on March 3, 1988, and the parties presented documentary and testimonial evidence.

On March 15, 1988, the parties entered into a consent order. The parties agreed to allow the plaintiffs to complete the 1987–88 school year at East Albemarle Elementary School. The parties further agreed that the evidence presented at the hearing is "in substance all the relevant evidence" concerning plaintiffs' claims. The parties ultimately agreed that the court should consider the merits of the case on cross motions for summary judgment.

## APPLICABLE LAW

State laws providing for racially segregated schools violate the Equal Protection

Clause of the constitution, *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and there is "a presumption of segregation against schools that are substantially disproportionate in their racial composition." *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). School boards are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

Of course, "the mere implementation of a desegregration plan does not convert a dual system into a unitary one":

> All aspects of public education must be freed from the vestiges of state sanctioned racial segregration before a system becomes unitary. Integration must occur in the system's faculty, staff, transportation practices, extracurricular activities, facilities and pupil assignments.

*Riddick v. School Board of City of Norfolk,* 784 F.2d 521, 533 (4th Cir.1986). *See Green* 391 U.S. at 435, 88 S.Ct. at 1692–93; *School Board of The City of Richmond v. Baliles,* 829 F.2d 1308, 1312 (4th Cir.1987) (suggests that "comparative dropout rates, graduation rates, and scores on standardized tests", could be considered in making the determination of whether a system has been unitary) (does not decide whether the elapse of a "long time" dissolves the presumption of segregation).

In the process of dismantling a dual system, a school board must not take "any action that would impede the process of converting to a unitary system. The board is under a heavy burden of showing that any action it takes that continues the effects of the illegal dual system serves a legitimate end." *Riddick* 784 F.2d at 535. "Rescission of a voluntary desegration plan itself may be found to be an act of segregation for a school board which has been found to have practiced de jure segregation

and has not completed the transition from a dual to a unitary system." *Id.*

School boards have "plenary" authority to rectify a dual system, and in the exercise of such "broad discretionary power", the school boards may require complete racial balance. *See Swann* 402 U.S. at 16, 91 S.Ct. at 1276. In this regard, the Supreme Court has stated that the school boards may "take whatever steps are necessary", including racial preferences, to eradicate the lingering evils of segregation. *Green* 391 U.S. at 437–38, 88 S.Ct. at 1693–94. "Judicial authority [to fashion remedies] enters only when local authority defaults." In such instances, the courts have broad "equitable powers to remedy past wrongs." *Swann* 402 U.S. at 16, 91 S.Ct. at 1276. *See Milliken v. Bradley* 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (prescribes a three-part test for determining the validity of an equitable decree).

Upon a finding that a system is unitary, "the presumption that current disparities are causally related to prior segregation.... ends." *Baliles* 829 F.2d at 1311. The burden of proof switches to the party challenging the school board's action. *Id.* "A plaintiff must show discriminatory purpose on the part of the defendant in order to make out a constitutional violation." *Riddick* 784 F.2d at 543. Discriminatory impact alone is not sufficient. *Id.* In short, once a system reaches unitariness, the "school boards and not the federal courts will run the schools, absent a showing of an intent to discriminate." *Id.*

In a unitary system, the discriminatory intent test applies whether a black plaintiff is challenging an alteration of the desegregation plan, or a white plaintiff is challenging the continuation of such a plan. In discerning the purpose of a board's actions, however, the history of segregation in the system is clearly relevant. *See Riddick* 784 F.2d at 539 ("history of discrimination cannot and should not be ignored"). *See also Dowell v. Board of Education of the Oklahoma City Public Schools,* 795 F.2d 1516, 1520 (10th Cir.1986) (the purpose of court-ordered school integration is not only to achieve, but also to *maintain,* a unitary

school system). Thus, a board's efforts to maintain a unitary system, to preserve the accomplishments of the desegregation, do not usually amount to purposeful discrimination against the whites, for the board's *purpose* is to avoid resegregation, not to discriminate against white students. If possible, courts should defer to the school board unless the board's actions unduly trammel on the rights of white students. In this regard, a board has "broad discretionary power" to maintain racial balance, *see Swann* 402 U.S. at 16, 91 S.Ct. at 1276, provided that that any burden attending the pupil assignments is, to the extent practicable, equitably shared by the races, and that the assignments do not create an onerous burden on the students. *See Kromnick v. School District of Philadelphia*, 739 F.2d 894, 902 (3rd Cir.1984) (assignment of teachers is ordinarily a "function within the exclusive prerogative of the school district"); *Valley v. Rapides Parish School Board*, 702 F.2d 1221, 1227–28 (5th Cir.1983) (in pre-unitary system, court focused on whether busing was unduly burdensome and whether there was an "equitable allocation of the burden"). *Cf. Wygant v. Jackson Board of Education*, 476 U.S. 267, 281, 106 S.Ct. 1842, 1850, 90 L.Ed. 2d 260 (1986) ("sharing of burden" sanctioned as a means to cure "the effects of prior discrimination"). Unless heavily burdensome, pupil assignments do not implicate the right to an equal educational opportunity and, consequently, do not trammel on the educational rights of white students. *See United States v. Paradise*, 480 U.S. 149, —— n. 2, 107 S.Ct. 1053, 1078 n. 2, 94 L.Ed.2d 203, 233 n. 2 (1987).

## ANALYSIS

As is evident from the applicable law, whether Stanly County has become a unitary system is not dispositive to the resolution of this case, for unitary or not, SCBE's transfer policy does not violate plaintiffs' rights to equal protection under the law. Clearly, SCBE has made laudable efforts to eradicate the vestiges of discrimination. Testimony at the hearing, however, suggested that the system may not have attained unitariness. The court is reluctant to decide the unitariness question on the record before the court. For these reasons, the court will not rule on whether Stanly County is a unitary school system, noting again that such a finding is not dispositive to the resolution of this case.

If analyzed under pre-unitary law, SCBE's policy of denying whites in the Badin attendance area a transfer into the Albemarle City school system is a fully permissible, if not required, measure to comply with the desegregation mandate. SCBE operated a de jure segregated system as of some 25 years ago. Additionally, the Federal District County of the District of Columbia listed Stanly County as having one or more racially disproportionate schools. Thus, SCBE is clearly duty-bound to rectify the disproportionality and to achieve a unitary system. At the behest of HEW, SCBE has implemented its transfer policy. No one contends that such a policy violates the whites equal protection rights in a pre-unitary system, for SCBE is required "to take whatever steps are necessary" to convert the Stanly County into a unitary school system. *Green* 391 U.S. at 437–38, 88 S.Ct. at 1693–94. Indeed, "the rescission of a voluntary desegregation plan [such as SCBE's desegregation transfer policy] may be found to be an act of segregation for a school board [such as SCBE] which has been found to have practiced de juri segregation and has not completed the transition from a dual to a unitary system." *Riddick* 784 F.2d at 535.

If analyzed under the post-unitary law, the result is clearly the same. SCBE's policy clearly does not amount to intentional discrimination against white students. The policy's purpose is to preserve the accomplishments of desegregation, not to discriminate against whites. The facts indicate that there are over 125 white students who, like plaintiffs, reside in Albemarle City and yet belong to the Badin Attendance Area. If all these white students were permitted to transfer out of Badin, it would negate the hard-earned racial balance now present in SCBE's school system. Furthermore, the minimal burden on white students of not having the opportu-

nity of transferring into Albemarle City schools, and thereby having to travel an extra mile or so to school, is not of constitutional significance. Plus, the white students have not shouldered this minor burden alone. Black students have been denied the opportunity to transfer into Badin Elementary. Other black students have been transferred out of Badin Elementary and into New London Elementary. In short, SCBE's policy has improved and maintained the racial balance in the school system—the intended effect—without disproportionately or unduly burdening white students.

## CONCLUSION

Plaintiffs' claim under the Equal Protection Clause is without merit. The court, accordingly, GRANTS defendants' motion for summary judgment.