WYNN, Circuit Judge,
dissenting:
In 2010 parents of minor children attending schools in Pitt County and the Pitt County Coalition for Educating Black Children (“Appellants”) sought to enjoin implementation of the Pitt County Board of Education’s (“Board”) 2011-2012 student assignment plan (“2011-2012 Plan”). Appellants alleged that the 2011-2012 Plan, which resulted in the opening of a racially identifiable school and increased racial imbalance across the school district, and which the Board’s own members described as “disappointing ... for racial balance,” J.A. 618, violated the Board’s obligations under controlling desegregation orders, including a 2009 consent order that directed the Board to “work toward attaining unitary status.” J.A. 204.
The first time the district court considered Appellants’ motion, it improperly placed the burden of proof on Appellants. On appeal, we vacated the district court’s denial of the motion, and remanded with instructions to apply the Supreme Court-mandated presumption that any racial disparities in 2011-2012 Plan resulted from the School Board’s prior unconstitutional conduct in operating a racially segregated school district. Everett v. Pitt Cutty. Bd. of Educ., 678 F.3d 281, 288 (4th Cir.2012) (“Everett I”). We further held that the School Board' bore the burden of proving that the plan “moves the school district toward unitary status” in compliance with a 2009 Consent Order issued by the district court. Id. To be sure, at the time of the appeal in 2013, the Board did not dispute that it had yet to obtain unitary status and thus had a duty to eliminate the vestiges of past discrimination and demonstrate good faith compliance with prior desegregation orders.
Our words, it would appear, have fallen upon deaf ears. The district court expressly did not consider whether the Board had met its burden, with respect to the 2011-2012 Plan. Nor did the court substantially take the plan into account when deciding whether the Board had complied in good faith with the 2009 Consent Order. Instead, it ruled that the school district became unitary in 1986, and thus deemed the Board “released” from the burden that we and the district court’s own prior order said it had. The district court concluded:
Even assuming, arguendo, that the School Board is unable to meet its burden of proof as to the 2011-2012 plan, an order enjoining the continued implementation of this plan would be pointless since the district court has been declared unitary and no longer has an affirmative duty to ensure that its policies move the district towards unitary status.
J.A. 568-569 (emphasis added).
Yet how could the school district be declared unitary if it never met “its burden of proof as to the 2011-2012 Plan”? As Everett I stated, in no uncertain terms, satisfying this burden was a condition precedent to the declaration of unitary status.
Our consideration of this case does not occur in a vacuum. The rapid rate of de facto resegregation in our public school system in recent decades is well-documented. As one scholar put it, “Schools are more segregated today than they have been for decades, and segregation is rapidly increasing.” Erwin Chemerinsky, Separate and Unequal: American Public Edu *151 cation Today, 52 Am. U.L.Rev. 1461, 1461 (2003) (footnote omitted); see also Lia B. Epperson, Resisting Retreat: The Struggle for Equity in Educational Opportunity in the Post-Brown Era, 66 U. Pitt. L.Rev. 131, 145 (2004) (“American public schools have been steadily resegregating for more than a decade, dismantling the integrative successes of hundreds of districts that experienced significant levels of integration in the wake of Broum and its progeny. Such racial isolation in public schools is worse today than at any time in the last thirty years.”).
Today the majority upholds the Board’s promulgation of a student assignment plan that, Appellants argue, furthers this trend. The majority reaches that result out of deference to a district court decision that utterly fails to analyze the facts in this case in compliance with this Court’s instructions and established Supreme Court precedent.
Though it is pleasing to hear that the district court takes comfort in the Supreme Court’s recent proclamation in Shelby County v. Holder, — U.S. —, 133 S.Ct. 2612, 2625-26, 186 L.Ed.2d 651 (2013), that “our Nation has made great strides” in ensuring the civil rights of minorities since the 1960s, see J.A. 569, these words are not a panacea for difficult cases involving race, particularly when the “facts on the ground” “eaution[ ] ... against” resting on the laurels of prior generations. League of Women Voters of N. Carolina v. N. Carolina, 769 F.3d 224, 243 (4th Cir.2014) cert. denied, — U.S. —, 135 S.Ct. 1735, 191 L.Ed.2d 702 (2015). Undeniably, in certain cases, there are other famous words that ring all the more true: “The past is never dead. It’s not even past.”[1]
The district court’s errors here are twofold and interrelated: First, the district court failed to consider the effects of the 2011-2012 Plan when determining whether the School Board complied in good faith with prior orders, a condition precedent to the district court’s declaration of unitary status. Second, and relatedly, the district court gave retroactive effect to its declaration of unitary status so as to retroactively release the Board of its obligations under controlling desegregation orders in direct contravention of this Court’s opinion in Everett I. The district court’s order should not be affirmed. It should be vacated and remanded for proceedings consistent with our opinion in Everett I and controlling Supreme Court precedent. Accordingly, I respectfully dissent.
I.
The Supreme Court declared discrimination on the basis of race in public education unconstitutional in 1955, yet, the “deliberate speed,” Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), of integration did not reach Pitt County, North Carolina until 1970. Two separate lawsuits filed in the 1960s in the Eastern District of North Carolina seeking the desegregation of Pitt County and Greenville City Schools, which at the time were operated as two separate school systems. See Teel v. Pitt County Board of Education, Civ. A. No. 569 (E.D.N.C. filed August 10, 1970); Edwards v. Greenville City Board of Education, Civ. A. No. 702 (E.D.N.C. filed July 7, 1970). In those cases, from which this case arises, the district court determined that Pitt County and Green-ville City Schools were operating racially segregated dual school districts in violation of the Fourteenth Amendment.
*152 As the majority describes, after the school systems’ proposed desegregation plans were finally approved, the Teel and Edwards cases remained dormant for over three decades until the Greenville Parents Association (“GPA”), a group of predominantly white parents, filed a complaint with the U.S. Department of Education Office for Civil Rights, objecting to the Board’s use of race in its student assignment plan for the 2006-2007 academic year.
The GPA’s challenge to that plan culminated in a 2009 settlement to which Appellants and the Board were parties. The settlement recognized that the parties “believe that unitary status for [Pitt County Schools] is a salutary goal, and all parties pledge to work together to achieve that goal.” J.A. 195. On November 4, 2009, the district court issued an order approving the settlement (“2009 Consent Order”). In addition to incorporating the terms of the parties’ settlement agreement, the 2009 Consent Order further obligated the parties to “work toward attaining unitary status so that the [district] court may relinquish jurisdiction over this case and restore to the School Board full responsibility for the operation of its schools.” J.A. 204 (emphasis added). The 2009 Consent Order also directed the parties to submit, on or before December 31, 2012, “a report detailing the School Board’s efforts and progress in achieving unitary status and eliminating the vestiges of past discrimination to the extent practicable.” J.A. 204.
To assist in its formulation of the 2011-2012 Plan, the Board enlisted the Operations Research and Education Laboratory of North Carolina State University. After considering the three scenarios outlined in the majority opinion, in November 2010 the Board settled on the 2011-2012 Plan. Plaintiffs expert testified that the plan adopted by the Board was the most segre-gative option it considered. And even according to the Board’s expert’s methodology, three schools — C.M. Eppes, South Greenville, and G.R. Whitfield — became racially imbalanced as a result of the 2011-2012 Plan. Also, Lakeforest Elementary opened as a “racially identifiable school,” with nearly 80% black enrollment. J.A. 558.
Some of the Board’s own members appeared to question whether the 2011-2012 Plan was consistent with the Board’s obligations under controlling desegregation orders'. For instance, Board Member Tol-mie, noting that the plan would open Lake-forest with only 12% white enrollment and make South Greenville Elementary 17% white, found the plan “disappointing ... for racial balance.” J.A. 618. He believed that “there must be a better map for diversity.” J.A. 618. Others believed the plan would compromise opportunity for some students and inhibit the district’s efforts to achieve unitary status.
On April 19, 2011, Appellants filed a motion for injunctive and other appropriate relief seeking to enjoin the implementation of the 2011-2012 Plan, arguing that it violated the Board’s obligation to move the district toward unitary status. The district court construed Appellants’ motion as a request for a preliminary injunction. Because the court determined that Appellants had failed to demonstrate a likelihood of success on the mérits, it denied the motion.
Appellants appealed to the Fourth Circuit, and this panel vacated the decision and remanded, concluding that the district court had improperly placed the evidentia-ry burden on Appellants. Everett I, 678 F.3d at 289. Specifically, we held:
Given that there is no dispute that the school district has not attained unitary status, the evidentiary burden should have been on the School Board to prove *153 that the 2011-12 Assignment Plan' is consistent with the controlling desegregation orders and fulfills the School Board’s affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.
Id. at 290. We further noted that “the 2009 Consent Order does not settle the core dispute that arose in the 1960s and 1970s, namely, the School Board’s unconstitutional operation of a dual school system and its continuing affirmative obligation to eliminate the vestiges of discrimination and move toivard unitary status.” Id. at 290 n. 8 (emphasis added).
On July 6, 2012, the Board filed a motion for unitary status, arguing that the school system was unitary as of 2000. Over Appellants’ objection, the district court decided to consider the Board’s motion for unitary status together with Appellants’ remanded motion to enjoin the 2011-2012 Plan.
The district court conducted a five-day bench trial in July 2013. The Board’s expert, Dr. Armor, concluded that as of 1986, nearly three decades ago, Greenville City Schools and Pitt County Schools had each obtained unitary status and that any subsequent imbalance was not a vestige of de jure discrimination, but rather was due to demographic changes. In reliance on Dr. Armor’s testimony, the district court concluded that prior to the 1986 merger, both the Greenville City Schools and the Pitt County Board of Education successfully implemented their court-ordered plans, fully desegregated all schools within both districts, and maintained a high level of integration until merger.
The district court further concluded that post-merger, the Board adopted policies to maintain racial balance and succeeded in the vast majority of schools and found that significant demographic shifts had occurred in the post-merger period. In this analysis, the district court only briefly mentioned the 2011-12 Plan. Importantly, the district court acknowledged that it made no effort to determine whether the Board met its burden of demonstrating that “the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board’s affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.” Id. at 290 n. 8. Rather, the court assumed that it did not, without deciding the issue, and determined that Appellants’ motion for injunctive relief was moot, stating: '
Even assuming, arguendo, that the School Board is unable to meet its burden of proof as to the 2011-2012 plan, an order enjoining the continued implementation of this plan would be pointless since the school district has been declared unitary and no longer has an affirmative duty to ensure that its policies move the district toward unitary status.
J.A. 568-569 (emphasis added).[2]
II.
A.
For a court tó release a school district from prior desegregation- orders, a school district must “comply in good faith with [school desegregation orders].” Everett I, 678 F.3d 281 (citing Bd. of Educ. v. Dowell, *154 498 U.S. 237, 248-50, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991)). In determining whether a school board has shown a good faith commitment to prior desegregation orders, courts look to whether the school board’s policies “form a consistent pattern of lawful conduct directed to eliminating earlier violations.” Freeman v. Pitts, 503 U.S. 467, 491, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).
The Supreme Court has explained the rationale for requiring a showing of good faith compliance:
A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new de jure violation, and enables the district court to accept the school board’s representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future.
Id. at 498-99, 112 S.Ct. 1430. The importance . of the good faith requirement is particularly salient in this case, where the parties entered into a settlement in 2009, memorialized in the district court’s 2009 Consent Order, which required the Board to move the district towards unitary status. As a result of the settlement, parents of school children forwent legal action in favor of a cooperative agreement premised on the Board’s commitment to working towards the laudable goal of a racially balanced school system. Whether the board complied in good faith with that directive would be undeniably probative of its commitment to maintaining a racially balanced school system even after the desegregation orders were lifted and the district court relinquished jurisdiction over the ease. Such a determination is important not only to instill confidence in the district court when it decides whether to release the district from its purview, but also to the stakeholders in this litigation consisting primarily of parents of minor school children.
In concluding that the Board had complied in good faith with prior desegregation orders, the district court found that the pre-merged school systems had fully implemented the Teel and Edwards orders in a short period of time and had sought faithfully to comply with those orders notwithstanding considerable demographic shifts in the district in the intervening years. The district court also stated that the Board’s reluctance to seek a declaration of unitary status was evidence that the Board was committed to continued integration of its schools.
Yet the district court failed to substantially account for the Board’s actions in the wake of the 2009 Consent Order. Appellants argue that the Board’s adoption of the 2011-2012 Plan, which came on the heels of the 2009 Consent Order and resulted in more rather than fewer racially imbalanced schools in the district constituted a violation of the Board’s obligation to move towards unitary status under with the 2009 Order. Indeed, applying Dr. Armor’s metrics for assessing racial imbalance, C.M. Eppes, South Greenville, and G.R. Whitfield schools all became racially imbalanced as a result of the 2011-2012 Plan. Lakeforest Elementary opened as a racially identifiable school with a black population of nearly 80%. In the view of Appellants’ expert, the plan adopted by-the Board was the most segregative option it considered. Board members questioned whether the 2011-2012 Plan satisfied the Board’s obligations to eliminate racial imbalance in its schools. Board Member Tol-mie found the plan “disappointing ... for racial balance” and believed that “there must be a better map for diversity.” J.A. 618. Others echoed similar sentiments.
As has long been recognized, a court clearly errs when it fails to consider sub *155 stantial evidence contrary to its ultimate finding. Miller v. Mercy Hosp., Inc., 720 F.2d 356, 361 (4th Cir.1983). Given that the Board had alternatives available that would result in higher levels of racial balance in the district, and acted with full awareness of the regressive impacts on the school district’s racial balance, the Board’s decision to adopt that approach, at the very least, ought to have received closer scrutiny from the district court.
Thus, the district court’s finding that the Board complied in good faith with prior desegregation orders should be vacated and the case remanded for further consideration.
B.
What is perhaps even more troubling about the district court’s decision is that by failing to consider the impacts of the 2011-2012 Plan, the district court effectively made retroactive its declaration of unitary status.
In Everett I, we stated:
Even if we assume that the district court will fully consider the issue of unitary status in December 2012, this does not absolve the School Board from the bur,den of demonstrating to the district court, as Green v. Cnty. Sch. Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and its progeny require, that, the 2011-2012 Assignment Plan moves the school district toward unitary status, particularly where this plan allegedly causes immediate and substantial adverse effects on students.
678 F.3d at 288. We further explained, “Any other conclusion would necessarily, but impermissibly, provide the School Board with latitude to discriminate pending the resolution of some future hearing.” Id. at 288. Cf. Capacchione v. Charlotte-Mecklenburg Bd. of Educ., 57 F.Supp.2d 228, 285 (W.D.N.C.1999) (“[A] unitary status determination is not retroactive, and therefore, the termination of court supervision today cannot relate back to an earlier time.”). By declaring the district unitary and its burden with respect to the 2011-2012 plan moot, the district court has directly contravened our instructions. That is precisely what the district court’s decision and the majority’s affirmance of that decision does here. Such a holding has troubling implications: will others bound by desegregation orders take the majority’s holding as a signal that de facto unitary status in the eyes of a school district gives the school district license to act as though it were not under court order?
The majority justifies its ruling by pointing to School Board of Richmond v. Baliles, 829 F.2d 1308, 1312 (4th Cir.1987), yet the procedural posture of this case differs significantly from that of Baliles, particularly in light of the 2009 Consent Order in this case. Moreover, the majority opinion’s reading of Baliles directly conflicts with our holding in Everett I. In Baliles, plaintiffs sought to force Virginia to fund programs designed to eliminate vestiges of segregation. The district court ruled that, because the school district had already achieved unitary status as a factual matter, the burden shifted to the plaintiffs to prove their case. 639 F.Supp. at 687 & n. 3 (citing Riddick v. Sch. Bd., 784 F.2d 521, 534, 538 (4th Cir.1986)).
This Court ruled in Everett I that the burden of proof remained with the Board to prove “that the 2011-12 Assignment Plan is consistent with the controlling desegregation orders and fulfills the School Board’s affirmative duty to eliminate the vestiges of discrimination and move toward unitary status.” Everett, 678 F.3d at 290. The Board was further obligated to demonstrate good faith compliance with prior orders including the 2009 Consent Order *156 which immediately preceded the promulgation of the 2011-2012 Plan. Nothing, in Baliles entitles the district court to ignore that directive.
III.
In failing to fully address the impacts of the 2011-2012 Plan, the district court declined to determine whether the School Board complied in good faith with prior orders, and retroactively relieved the Boárd of obligations under those orders. The district court’s declaration of unitary status should be vacated, and this case remanded. For the foregoing reasons, I respectfully dissent.

. William Faulkner, Requiem for a Nun 92 (1951).

. Even the majority opinion concedes in footnote 7 that “by determining that Plaintiffs' motion to enjoin the 2011-12 student assignment plan was moot, the district court necessarily found — even if it did not say so expressly — that the school district was unitary at the time of the implementation of the 2011-12 plan,” and that the district court had found that the two then-separate districts were unitary as to student assignment. Ante at 140.