758 F.2d 983
 23 Ed. Law Rep. 1291
 Sylvester J. VAUGHNS, Jr., by his father and next friend,
Sylvester J. VAUGHNS, et al., Appellees,
and
Jesse Alexander Eller, et al., Plaintiffs,
v.
BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al., Appellants,
and
Thomas John Grenchik, et al., Defendants.
Sylvester J. VAUGHNS, Jr., by his father and next friend,
Sylvester J. VAUGHNS, et al., Appellants,
and
Jesse Alexander Eller, et al., Plaintiffs,
v.
BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al., Appellees,
and
Thomas John Grenchik, et al., Defendants.
 Nos. 83-2048(L), 83-2049.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 9, 1985.
Decided March 28, 1985.
 
 Joseph M. Hassett, Washington, D.C. (David S. Tatel; John C. Keeney, Jr., Patricia A. Brannan, Daniel S. Cohen, Hogan & Hartson, Michael Sussman, Teresa Demchak, Washington, D.C., NAACP Special Contribution Fund on brief), for appellants.
 Paul M. Nussbaum, Greenbelt, Md. (Andrew W. Nussbaum; Reichelt, Nussbaum & Brown, Greenbelt, Md., on brief), and George D. Solter, Baltimore, Md. (Gerson B. Mehlman; Whiteford, Taylor, Preston, Trimble & Johnston, Baltimore, Md., on brief), for appellees.
 Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 This appeal and cross-appeal are the latest round in the Prince George's County school desegregation litigation begun in 1972. Plaintiffs and the Board of Education (Board) appeal from an order of the district court directing the Board to take further specific steps to desegregate its schools upon the finding that the Board had failed to discharge all of its obligation to achieve a unitary school system. Vaughns v. Board of Education of Prince George's County, 574 F.Supp. 1280 (D.Md.1983). The Board contends that the district court had no jurisdiction in the case both because the school system had achieved unitary status when the Board implemented a racially neutral school assignment plan, and because the district court had relinquished jurisdiction in 1974 and 1975 and had found in 1975 that the Board had achieved unitary status.
 
 
 2
 The district court declined to grant other relief sought by plaintiffs because it found that although the Board unilaterally cancelled a portion of its busing plan, thereby violating the district court's 1973 desegregation order, it did not act with discriminatory intent or with the purpose to cause resegregation. Additionally, the district court found that racial disparities in assignment of pupils to the County's special education and talented and gifted (TAG) education programs were not causally connected to prior segregation. These findings are the subject of plaintiffs' appeal. They contend that the district court misapplied the law in finding that the Board had no discriminatory intent and that the district court misplaced the burden of proof in requiring plaintiffs to show a causal relationship between past segregation and present racial disparities in the special education and TAG programs. Finally, plaintiffs contend that they are entitled to more extensive relief than that granted by the district court even where they prevailed.
 
 
 3
 We find no merit in the Board's arguments that the district court lacked jurisdiction to grant additional relief and that the system had attained unitary status. We similarly find no merit in plaintiffs' arguments that the district court erred in finding no intentional discrimination and that it granted inadequate relief. We conclude, however, that the district court erred in making its findings regarding the special education and TAG programs, since it failed to give effect to the presumption to which plaintiffs were entitled and which it was the Board's burden to overcome that present racial disparities are causally related to the prior unconstitutional segregation. Even though the district court found that the Board had taken substantial affirmative steps to guard against racially discriminatory placement and that placement was not tainted by prior unlawful segregation, we think that these findings must be set aside and the case remanded to the district court to make new findings under the proper rule as to burden of proof and giving effect to the presumption.
 
 
 4
 We therefore affirm in part and reverse and remand in part.
 
 I.
 
 5
 On March 29, 1972, parents of black Prince George's County schoolchildren brought a class action suit seeking a declaratory judgment that the County's school system did not meet constitutional standards for school desegregation. In that first case, the district court, with Judge Frank A. Kaufman presiding, found that the County had maintained a dual school system segregated by state law until 1954 and that the county had since failed to dismantle that dual system. Vaughns v. Board of Education of Prince George's County, 355 F.Supp. 1034, 1035, 1037 (D.Md.1972).[1] The district court ordered the Board to submit a plan for student attendance and other matters that would bring the system into total compliance with constitutional standards as quickly as possible. Id. at 1037. On December 29, 1972, the district court ordered implementation of a desegregation plan, which required the realignment of school attendance areas and the creation of noncontinguous attendance areas to be accomplished, in part, by student busing. 355 F.Supp. 1051 (D.Md.1972), aff'd, No. 73-1024 (4 Cir. Jan. 23, 1973), cert. denied, 414 U.S. 999, 94 S.Ct. 352, 38 L.Ed.2d 235 (1973) (the 1973 Order).[2] The district court reserved for later determination such other issues as faculty and administration hiring and assignment and school construction. It also retained jurisdiction as mandated by Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), to supervise implementation of the student attendance plan.
 
 
 6
 The 1973 order contained flexible guidelines that no school should be less than 10% or more than 50% black.[3] These guidelines were to be met by coupling contiguous areas in a school district with noncontiguous "off areas" in the same sector. The plan required some additional busing. Because 48% of the student population was already riding buses to school, and because the court limited court-ordered busing to those trips that could be completed in 35 minutes, the plan put only an additional 8% of the student population on wheels.
 
 
 7
 By orders of November 27, 1974, and March 13, 1975, the district court relinquished its jurisdiction over the case with the following proviso:
 
 
 8
 (3) Further, this court will entertain at any time a request from any one or more of the plaintiffs or defendants in this case to assume jurisdiction over any and all aspects of this case and of the decree and decrees set forth herein, and in connection with consideration of any such request and the determination of any of the issues raised therein, will consider and determine whether to reopen this case in its entirety or in part and to assume jurisdiction in full or in part over the subject matter of this case and the parties thereto at such time.
 
 
 9
 During the period prior to the March 13, 1975 order, the district court and all parties understood and agreed that modifications in the plan might be necessary in order to ensure effective desegregation and that the court would continue to monitor the plan's implementation. The Board submitted four status reports to the district court during this period. In them, the Board recognized that many schools had slipped out of compliance with the desegregation plan's guidelines and that other schools were in danger of "tipping," of reacquiring one-race status. The reports indicated a willingness to modify the plan to guard against tipping.
 
 
 10
 The March 13, 1975 order grew out of a hearing held nine days earlier to consider the request by a single community, Dresden Green, for modification of part of the 1973 order as it affected that community. Plaintiffs were not present at that hearing, though they did have notice of it. In rejecting Dresden Green's request for modification, Judge Kaufman said in colloquy with counsel that he declined to act as a "super school board" and that the County's plan was meeting "constitutional obligations and standards." No evidence on the issue of unitary status was adduced at that hearing. Nor did the district court explicitly find that the school system had achieved unitary status. Further, as it did in both the November 1974 and the March 1975 orders, the district court stated at the hearing that it reserved the right to resume jurisdiction as appropriate upon the motion of any party.
 
 
 11
 Once the district court relinquished an active supervisory role over the operation of the school system, the Board took no further affirmative steps to eliminate the effects of pre-1973 discrimination, or to stabilize the system in the face of the threats that several schools would soon tip. However, the Board did consider impact on racial balance as a factor in making such decisions as those involving school construction or closings, and usually the Board avoided making decisions that would have serious resegregative effect.
 
 
 12
 The most important exception was the busing changes made in 1980. Prompted by parents' complaints and by a recognition that demographic changes were altering the impact and effectiveness of certain portions of the desegregation plan's busing scheme, the Board began to consider the issue of "unnecessary busing." The Board did not seek court approval for modification of the busing plan. Instead, it first approached plaintiffs seeking their acquiescence in such changes. When unsuccessful, it created the Citizens Advisory Committee on Busing (CAC) in November 1979, and instructed it to study every "off area" to determine where busing might be eliminated. The CAC was charged with ensuring that any recommended changes would not "significantly" alter the racial makeup of the schools, but the Board did not instruct the CAC on how great a change it deemed significant. The CAC's report relied heavily on the projections of the school staff regarding the consequences of busing changes. Most of the 1980 changes implemented by the Board were made despite projections, often understated, that they would have adverse effects upon racial balances within a significant number of elementary schools.
 
 
 13
 On September 1, 1981, certain of the named plaintiffs in the 1972 Vaughns decision moved to reopen the case alleging violations by the Board of outstanding court orders. Plaintiffs alleged that the Board still maintained a dual school system and specifically attacked its conduct in relation to faculty hiring, faculty assignments, special education for the handicapped and for talented and gifted students, student discipline, student classroom assignments, and student assignments to schools.[4] Plaintiffs claimed that the Board had failed to eliminate all vestiges of pre-January 1973 discrimination, that it had acted with discriminatory intent, particularly in eliminating portions of the busing plan in 1980, and that it had violated the outstanding 1973 order.
 
 
 14
 The Board opposed plaintiffs' motion to reopen, contending that the district court was without jurisdiction to grant further relief to plaintiffs because the Board had remedied pre-Brown discrimination during the period 1972 to 1975 and because the district court had relinquished jurisdiction thereafter.[5] On September 28, 1981, the district court granted plaintiffs' motion to reopen the case.
 
 
 15
 After a two-month trial, the district court filed its opinion and order resuming and exercising its jurisdiction and granting some of plaintiffs' requested relief. The district court, inter alia: directed that the Board apply a flexible guideline that no school shall have a black pupil population of less than 10% or more than 80%, subject to the Board's obligation to move the lower guideline upward and the higher guideline downward as practical; required the Board to consider the need "to achieve unitary status as quickly as reasonably possible" in making all decisions; and renewed the Board's obligation to file periodic reports to the district court. It is from this decision and order that the Board and plaintiffs both appeal.
 
 II.
 
 16
 Supporting the relief granted by the district court is its finding that the school system never achieved unitary status. The Supreme Court has repeatedly stated that where a school system has been segregated by law, that system has an affirmative duty to eliminate all vestiges of segregation "root and branch." Columbus Board of Education v. Penick, 443 U.S. 449, 458-59, 99 S.Ct. 2941, 2946-47, 61 L.Ed.2d 666 (1979); Green v. County School Board, 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968). Until a school system has discharged its duty to liquidate the dual system and replace it with a unitary one, the school's duty remains in place. Until a unitary system is created, a school system is not absolved from this duty by reason of demographic changes. Lee v. Macon County Board of Education, 616 F.2d 805, 810 (5 Cir.1980).
 
 
 17
 A district court's jurisdiction to grant further relief in school desegregation cases is not perpetual, however. Once a school system has achieved unitary status, a court may not order further relief to counteract resegregation that does not result from the school system's intentionally discriminatory acts. Pasadena City Board of Education v. Spangler, 427 U.S. 424, 436-37, 96 S.Ct. 2697, 2704-05, 49 L.Ed.2d 599 (1976); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 31-32, 91 S.Ct. 1267, 1283-84, 28 L.Ed.2d 554 (1971).
 
 
 18
 The Board contends that the circumstances contemplated by Pasadena were realized in Prince George's County, that present racial imbalances in the school system's student assignments were caused by subsequent demographic changes, and that the district court was therefore without jurisdiction to order additional relief. The Board's argument stems from its misinterpretation both of Pasadena and of the events culminating in the 1974 and 1975 orders.
 
 
 19
 In Pasadena, the Supreme Court held that because the Pasadena Unified School District (PUSD) had obtained the objective of racial neutrality in its school attendance pattern, "the District Court was not entitled to require the PUSD to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity." Pasadena, 427 U.S. at 436, 96 S.Ct. at 2704. As the district court ably demonstrated, however, this case differs markedly from Pasadena. 574 F.Supp. at 1343. All parties in Pasadena agreed that the plan initially achieved racial neutrality in student attendance, yet the district court mistakenly believed that it was nonetheless empowered to readjust annually school boundaries to ensure in perpetuity that there would be no majority of any minority at any Pasadena school. Pasadena, 427 U.S. at 433, 436, 96 S.Ct. at 2703, 2704. Such was not the case in Prince George's County. Neither plaintiffs nor the district court at any time assumed or conceded that a unitary system had been obtained, and plaintiffs quite early stated to the district court their belief that because the original desegregation plan was based in part on faulty population projections, it was not fully effective and would require future modifications. 574 F.Supp. at 1343. Indeed, the Board similarly recognized the need for modifications. Id. at 1343-44. More important, the district court found, and, as discussed below, we agree, that a unitary system was never achieved. Where racially neutral attendance patterns have not been completely achieved, Pasadena does not end the district court's remedial powers. Haycraft v. Board of Education of Jefferson County, Kentucky, 560 F.2d 755, 756 (6 Cir.1977); Martin v. Charlotte-Mecklenburg Board of Education, 475 F.Supp. 1318, 1342 (W.D.N.C.1979), aff'd, 626 F.2d 1165 (4 Cir.1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1758, 68 L.Ed.2d 238 (1981).
 
 
 20
 Even were the Board correct in interpreting Pasadena to say that merely by implementing a court-ordered school desegregation plan a school system has fully discharged its constitutional responsibility to desegregate, Pasadena would be inapposite here. Writing for the Court in Pasadena, Justice Rehnquist made plain that the case did not involve "a plan embodying specific revisions of the attendance zones for particular schools, as well as provisions for later appraisal of whether such discrete individual modifications had achieved [a] unitary system." Pasadena, 427 U.S. at 435, 96 S.Ct. at 2704. See also id. at 444 n. 2, 96 S.Ct. at 2708 n. 2 (Marshall, J., dissenting). From the inception of the 1973 Vaughns order, the parties understood and accepted that the plan was subject to modification and monitoring. 574 F.Supp. at 1343-44. The Board concedes as much at least for the period up to March 1975. Thus, by the Board's own admission, this case is of the sort excepted by Pasadena, and implementation of the court-ordered plan alone could not relieve the Board of all future responsibility to bring about a unitary system.
 
 
 21
 Nor do the 1974 and 1975 orders or the district court's comments at the March 4, 1975 hearing preclude its continuing exercise of its remedial powers in this case. Examined in context, these events fail to yield the meaning asserted by the Board. The district court, which is best able to interpret its own orders, United States v. Board of Education of Chicago, 717 F.2d 378, 382 (7 Cir.1983), concluded that these orders did not amount to a final relinquishment of jurisdiction. Instead, the district court found that its orders merely ended its active supervision, subject to resumption of jurisdiction as appropriate when requested by any party. 574 F.Supp. at 1341. The effect of these orders was merely to relieve the Board of its obligation to file periodic compliance reports, but not to relieve the Board of its affirmative duty to eliminate root and branch the vestiges of pre-1973 segregation. Id. We think that this interpretation is plainly correct.
 
 
 22
 Although the district court was of course aware of the Supreme Court's directive in Swann that once a school system has effectively desegregated, further intervention by the district court should not be necessary, 402 U.S. at 31-32, 91 S.Ct. at 1283-84, it made no finding on the progress of desegregation in the County. It was fully informed that the desegregation plan had only partially accomplished its task and that many schools either remained racially identifiable or were on the brink of reacquiring racial identity. In recognition of this situation, at the March 4, 1975 hearing, Judge Kaufman stated again that the district court would reassert jurisdiction when appropriate and expressed his concern about the danger of tipping. Moreover, the district court correctly states that the March 4, 1975 hearing "was in no sense a detailed factual inquiry into the status of desegregation in county schools." 574 F.Supp. at 1340. No evidence was taken on that question, and plaintiffs were not in attendance, though they did have notice.
 
 
 23
 Finally, Judge Kaufman's comments must be considered in light of the hearing's purpose. The Dresden Green community sought exemption from the plan on the ground that as an integrated community it had no obligation to participate. In rejecting the claim, Judge Kaufman stated that he would not act "as a super school board," and that the plan was meeting "constitutional obligations and standards." The district court has found that these comments "indicate[d] only that defendants were in 1975 doing what they could at that time to try to meet 'constitutional obligations and standards.' " Id. at 1339.
 
 
 24
 We adopt this finding. The district court's awareness of the large number of County schools that were outside of the plan's guidelines and its provisos reserving the power to resume jurisdiction belie the Board's assertion that this comment constituted a finding that the Board had fully discharged its constitutional duty. Rather, it expressed Judge Kaufman's recognition of the Board's efforts and his hope that the Board and plaintiffs might work together to make the plan fully effective without the district court's active supervision and interference. There was a basis for such hope in March 1975. The Board had stated that it would be willing to make modifications in order to ensure compliance, and plaintiffs had said the year before that although the parties disagreed on the extent of necessary adjustments they agreed to attempt to reach agreement on the problem before turning to the court for further relief. Id. at 1343 (citing Plaintiffs' Exh. 157, Plaintiffs' Letter of January 25, 1974 in Response to the Third Report to the Court). Unfortunately, the Board frustrated this hope by misinterpreting the March 1975 order as relieving it of any continuing affirmative duty.
 
 
 25
 In sum, neither the Board's implementation of the court-ordered plan, nor the district court's 1974 and 1975 orders precluded the court's exercise of its jurisdiction to order further relief.
 
 III.
 
 26
 The district court made careful and detailed findings that the County school system had not achieved unitary status either during the period between 1973 to 1975, or at any later date. Id. at 1337-55. The factual findings of the district court in school desegregation cases when the presiding judicial officer has lived with the case for many years are entitled to great deference on review. See Columbus Board of Education, 443 U.S. at 457 n. 6, 99 S.Ct. at 2946 n. 6; Goldsboro City Board of Education v. Wayne County Board of Education, 745 F.2d 324, 327 (4 Cir.1984). Here, however, the district court's findings would survive even the strictest standard of review and must be affirmed.
 
 
 27
 The district court notes that the 10%-50% guidelines were never intended as a rigid requirement unlike the no majority of any minority rule disapproved in Pasadena. It adds, however, that those guidelines were similarly not intended to be ignored. 574 F.Supp. at 1344. Yet, within months of the plan's implementation, the Board's June 1973 compliance report revealed that 23 schools had slipped out of compliance with the plan's guidelines. By March 1975, when the district court ceased active supervision, 41 schools were outside of the guidelines. Id. at 1354. According to plaintiffs' measure, by September 1975 over one-fifth of the system's schools were racially identifiable. Id. at 1352. These facts amply support the district court's conclusion that the school system had not attained unitary status at any time up to March 1975.
 
 
 28
 Just as clearly, the district court correctly found that the County school system has yet to attain unitary status. It found that in 1982 nearly one-fifth of all regular elementary schools had become more than 80% black. Because a majority of these 23 elementary schools were more than 50% black in 1972, the district court concluded that their identities as black schools had never been eradicated. Similarly, 15% of the County's senior high schools and 9% of its junior high and middle schools were in imminent danger of tipping and joining the ranks of these schools, while 9 schools were over 90% black with others close to joining their ranks. Further, the Board's unilateral cancellation of portions of the busing plan exacerbated the problem. Id. at 1354.
 
 
 29
 The district court committed no error in its findings, and it properly ordered additional relief.[6]
 
 IV.
 
 30
 With regard to special education, plaintiffs offered evidence of a disproportionately high black student enrollment in the special education program, particularly at the most restrictive levels of the special education program and for those handicaps requiring subjective evaluation. They also relied on a report prepared for the Office of Civil Rights that ranked the Prince George's County school system as fourteenth worst in the nation with regard to minority overrepresentation in special education. 574 F.Supp. at 1297-99. The district court concluded, however, that the evidence shows that the County's special education program does not discriminate against black children. Id. at 1299.
 
 
 31
 Plaintiffs correctly complain that the district court mistakenly placed upon them the burden of proving that present racial disparities in placement in the special education and TAG programs are causally related to pre-1973 segregation. The district court relied on Oliver v. Kalamazoo Board of Education, 640 F.2d 782, 810-11 (6 Cir.1980), in ruling that "the burden of proving the causal connection between the prior unconstitutional condition and the need for ancillary relief is upon those who attack." 574 F.Supp. at 1296 (citation omitted). The district court erred in relying on Oliver, since the burden shifted to plaintiffs in that case only because the school system had achieved unitary status with regard to student assignment. Oliver, 640 F.2d at 791-92. Because the County's school system had not attained unitary status, it is settled law that plaintiffs were entitled to a presumption that current placement disparities were causally related to prior segregation and that the burden of proving otherwise rested on defendants. Dayton Board of Education v. Brinkman, 443 U.S. 526, 537, 99 S.Ct. 2971, 2978, 61 L.Ed.2d 720 (1979); United States v. Gadsden County School District, 572 F.2d 1049, 1050 (5 Cir.1978).
 
 
 32
 We recognize that the district court made a complete record concerning the procedures for selecting candidates for special education and found that the safeguards against discrimination in the placement process outweighed the suggestion of discrimination in the statistical evidence.[7] Nonetheless, the district court's fact finding was tainted by the failure to recognize the existence of the presumption and the proper burden of proof, and we cannot say on this record that the error was harmless because the presumption was rebutted or that defendants satisfied their burden of proof. Those issues are for the district court in the first instance, and we must return the case to it for new findings made with proper regard to the presumption and correct burden of proof.
 
 
 33
 With regard to the TAG program, plaintiffs offered evidence of a disproportionately low black student enrollment but one which had markedly increased over the preceding five-year period. After a thorough exploration of the process by which children were selected to participate in the program, the district court concluded that it could not be said that the County school system had paid insufficient attention to the problem of black underrepresentation in the program.[8] Id. at 1307.
 
 
 34
 Here again, however, the district court's findings that "the Prince George's County school system has not intentionally discriminated and does not presently intentionally discriminate against black students in TAG placement, and in fact has taken and is taking affirmative steps to remedy the problem of underrepresentation of black students in the TAG program," id. at 1307, were made on an erroneous concept that plaintiffs were not entitled to a presumption supporting their position, and an erroneous concept of the burden of proof. Plaintiffs are entitled to have their case decided by the correct rules, and we are unable to say that their contentions concerning the TAG program would necessarily be resolved in the same way if the correct rules were observed.
 
 
 35
 We conclude therefore that the order of the district court with respect to special education and the TAG program must be reversed and this aspect of the case remanded for further proceedings consistent with what is said herein.
 
 V.
 
 36
 Plaintiffs contend that the district court made errors of law in determining that the Board had not acted with racially discriminatory intent in unilaterally eliminating a portion of the busing ordered by the district court in 1972 and that the district court erroneously declined to undo the busing changes.[9] We think that these assertions of legal error are lacking in merit.
 
 
 37
 The district court carefully and correctly stated and followed the governing Supreme Court precedent on proof of discriminatory intent. Id. at 1360-62. Plaintiffs mischaracterize the opinion by arguing that the district court based its conclusion on the "good faith" of the Superintendent and individual staff members, though the district court did acknowledge their good faith. Rather, the district court based its conclusion on plaintiffs' failure to prove intent to discriminate. Id. at 1370.
 
 
 38
 Plaintiffs apparently contend that proof that the 1980 busing changes had foreseeable resegregative consequences is per se evidence of discriminatory intent. Dayton, supra, clearly states otherwise, although the foreseeability of resegregation is some evidence of discriminatory intent. 443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9.
 
 
 39
 Plaintiffs correctly state that the Ninth Circuit, sitting in banc, has reversed its earlier affirmance of Diaz v. San Jose Unified School District, 518 F.Supp. 622 (N.D.Cal.1981), aff'd, 705 F.2d 1129 (9 Cir.1983), reversed in banc, 733 F.2d 660, 664 (9 Cir.1984). However, the district court did not rely on Diaz alone for the proposition that a preference for neighborhood schools is a plausible racially neutral explanation for the busing changes. See 574 F.Supp. at 1369 (quoting United States v. Texas Education Agency, 564 F.2d 162, 168 (5 Cir.1977), cert. denied, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979)).
 
 
 40
 The district court did not commit legal error. It found both facts that support a conclusion of intent to discriminate and others that support the opposite conclusion. Its findings regarding intent are, of course, entitled to great deference. Goldsboro, 745 F.2d at 327; Smith v. Town of Clarkton, North Carolina, 682 F.2d 1055, 1064 (4 Cir.1982). We cannot say that the district court's findings were clearly erroneous.
 
 
 41
 Plaintiffs also argue that the district court should have ordered the 1980 busing changes undone[10] and imposed more stringent guidelines for student assignments. The fashioning of remedies in school desegregation cases is a matter within the district court's discretion. Swann, supra, 402 U.S. at 15, 91 S.Ct. at 1275. These remedies must be reasonably related to the ultimate objective of desegregation. Valley v. Rapides Parish School Board, 646 F.2d 925, 938 (5 Cir.1981), cert. denied, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982). The district court's order should not be set aside unless it is an abuse of discretion. Milliken v. Bradley, 433 U.S. 267, 288, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977). Here, the relief granted is reasonably related to the objective of desegregation, and the district court has not abused its discretion.
 
 VI.
 
 42
 In sum, we conclude that the district court did not err in resuming jurisdiction and granting further relief. It did, however, fail to consider the presumption supporting plaintiffs' position, and it misplaced the burden of proof regarding plaintiffs' special education and TAG programs claims. As a consequence, the portion of its decree with respect thereto must be reversed and the case remanded for further proceedings. Otherwise, we find no error in the district court's findings or grant of relief.
 
 
 43
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 In September 1972, black students constituted 23.9% of the County's total student population. The majority of the County's 223 schools were one-race schools. By September 1982, black students constituted 53.9% of the total student population
 
 
 [2]
 Although the order was filed in December 1972, the court and the parties refer to it as the 1973 order. We adopt their appellation
 
 
 [3]
 As required by Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971), the district court adopted these guidelines not as a fixed mathematical formula, but as a flexible requirement or a starting point
 
 
 [4]
 Plaintiffs have not appealed the district court's findings in favor of the Board regarding faculty hiring and assignments, student discipline, and student classroom assignments
 
 
 [5]
 Prompted by defendants' argument, the NAACP and several Vaughns plaintiffs filed a new action restating the allegations of the motion to reopen. On November 27, 1981, the district court consolidated the two cases
 
 
 [6]
 We need not discuss in detail the district court's alternative ground for granting relief: that the Board violated the 1973 order by unilaterally cancelling portions of the busing plan in 1980. We note, however, that the district court correctly decided the issue. The Board contends that the 1973 order nowhere explicitly stated a continuing obligation to abide by its provision. This argument is particularly unavailing in light of the district court's extensive findings that the Board by its statements and actions both before and after 1975, acknowledged the continuing force of the 1973 order. 574 F.Supp. at 1356-59. Further, Pasadena places a school system under an unmistakable obligation to seek court-approved modification of a court's desegregation order rather than unilaterally disregarding it in whole or in part. 427 U.S. at 439-40, 96 S.Ct. at 2706
 
 
 [7]
 These safeguards include evaluation by a multi-disciplinary team using a variety of types of tests to dampen the potential effect of a single test being culturally biased. No single individual or test will determine a placement decision. Additionally, parents are invited to participate in the placement process, and no school will place a child without parental approval. Parents may also appeal if they disagree with the school about proper placement. Finally, the court noted that no parent had ever complained of race discrimination in the special education placement of a child. Id. at 1299-1301
 
 
 [8]
 The district court's findings outlined the school system's undertakings to ensure increased participation by black children in the program. Because of the possible cultural bias inherent in standardized tests, the County adopted alternative means of selecting TAG students. In addition to those students chosen by standardized tests, others are chosen by a multidisciplinary team upon referral by parents or teachers. Because of the possibility of teacher cultural bias, a problem which was initially manifest, the County has provided in-service training to help teachers identify TAG candidates. These efforts have culminated in the Strategies for Targeting Early Potential (STEP) program, directed primarily at identifying at an early age black children who are candidates for the TAG program. This program does not rely on standardized tests to select TAG students and does rely on inservice training of teachers. Id. at 1304-07
 
 
 [9]
 While the district court denied plaintiffs' prayer to undo the busing changes made without court approval, it should not be understood that it denied all relief in this regard. As part of its order revising the flexible guideline figures for minimum and maximum percentages of black student population in any school, the district court specified that "[t]he transportation time guideline shall continue to be 35 minutes each way." Id. at 1377. It is manifest that the district court intended that busing continue to be employed to achieve an acceptable racial mixture. But since the flexible guideline figures for acceptable racial mixture were altered, it obviously would have been inappropriate to require a return to a previous transportation pattern that would not accomplish those objectives
 
 
 [10]
 See n. 9, supra