SAROKIN, Circuit Judge,
dissenting:
One hundred years ago, the United States Supreme Court turned its back on the constitutional promise of equal protection of the law that this country made to its African-American citizens in the aftermath of the Civil War. In Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), the Court upheld the constitutionality of laws requiring the racial segregation of public facilities, including public schools, as “within the competency of the state legislatures,” id. at 544, 16 S.Ct. at 1140, and validated the infamous doctrine of “separate but equal.” See id. at 552, 16 S.Ct. at 1144 (Harlan, J., dissenting).
No one at the time could have truly believed for one instant that there was a shred of equality between the systems serving the white children and black children of the dual school systems. Yet it took close to sixty years for the Supreme Court to acknowledge the reality of segregation. In one of the most glorious moments of the history of the federal judiciary, the Court, speaking in a unanimous voice, effectively repealed the “separate but equal” doctrine by holding, in Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954), that “in the field of public education the doctrine of ‘separate but equal’ has no place.”
Along with Topeka, Kansas, the Supreme Court in Brown was considering the fates of three additional school systems: South Carolina, Virginia, and Delaware. Delaware became a part of this historic decision after the state’s Supreme Court ordered two districts to admit black children into de jure all-white schools. Gebhart v. Belton, 91 A.2d 137 (Del.1952). It was the appeal from that decision that was consolidated with the Topeka case.
There was no straight and unwavering march toward a color-blind school system in the aftermath of Brown, however. Rather, desegregation in Delaware and elsewhere has had a “long, tortured history,” Evans v. Buchanan, 447 F.Supp. 982, 1000 (D.Del.), aff'd, 582 F.2d 750 (3d Cir.1978), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). Resistance to the mandate of Brown was fierce, and at times violent. Then-Governor George Wallace of Alabama spoke for many when, standing on the front steps of the University of Alabama in Tuscaloosa, he denounced the “illegal usurpation of [state] power by the Central Government” and tried to block admission of African-American youngsters into the state university system.[1]
Delaware officials, as well, proved less than responsive to the constitutional mandate to desegregate the state’s public schools and, as a result, the federal courts were compelled to enforce the mandate one ruling at a time, culminating with this Court’s desegregation order in 1978. Evans v. Buchanan, 582 F.2d 750 (3d Cir.1978) (in banc), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). Today we are asked to lift this order.
*781 The Majority accurately reflects the tortured history of this matter. The elapse of four decades of litigation and court supervision clearly militates against its continuance, but it is also evidence of begrudging compliance with repeated court orders to desegregate. I find it ironic that the delay in implementing the orders of this court to end segregation is now being utilized to justify the end of court intervention. Although it is very tempting to end judicial supervision in the face of substantial progress, it would be unfortunate to abandon it just short of success. I dissent, not because I conclude that any of the findings of the district court are erroneous, but rather because accepting them causes me to conclude that some vestiges of past discrimination may remain, although I concede that many have been eliminated.
I concur with the majority’s recognition of the need to return control of schools to local communities, but only if and when we are satisfied that the goals established some 18 years ago have been substantially met. I challenge the majority’s suggestion that the court’s role in these matters has “denied multiple generations of elected officials the freedom to participate fully in representative government.” Majority at 779. The denial of that participation, if it occurred, was not due to judicial usurpation but rather arose from the discriminatory and unconstitutional conduct of many of those elected officials. It is not the courts who have delayed the return to local power, but it is those elected officials who failed to act “with all deliberate speed.” Brown v. Board of Education [Broum II ], 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955). Even if we are to withdraw our supervision at this juncture, I see little need to apologize for the court’s intervention in these matters. Without such intervention our schools would have remained separate and unequal and a segment of our nation would have been denied rights and opportunities to which all are entitled.
I. Shared principles
Before I articulate the reasons for my dissent, I want to underscore the shared premises under which the majority and I operate.
There is, first of all, no disagreement that “to extend federal court supervision indefinitely is neither practicable, desirable, nor proper,” Majority at 760, and this is not what I advocate today. At the same time, the Supreme Court has held that supervision by the courts should continue until “the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.” Freeman v. Pitts, 503 U.S. 467, 492, 112 S.Ct. 1430, 1446, 118 L.Ed.2d 108 (1992). Because the Appellees have not met this requirement, I believe that withdrawal of supervision is premature at this point.
Nor is there any disagreement between the Majority and the Dissent that “[t]he proper test under the Constitution is equality of opportunity, not of results.” Majority at 766. To the extent that the principal issue in this Dissent is the placement of African-American children in lower-level classes, and to the extent that the district court itself found that “lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college,” Coalition to Save Our Children v. State Bd. of Educ., 901 F.Supp. 784, 801, ¶ 49 (D.Del.1995), it is their opportunity to succeed academically that is at stake.
Finally, I share the Majority’s “reluc-tan[ce] to impose any unstated obligation on the school boards.” Majority at 777. At the same time, we should not impose or tolerate any limitations on the opportunity of young black students to participate equally in the educational process and derive all of the benefits therefrom.
II. Factual findings
I now turn to the substantive review of the district court’s ruling. First, I agree with the Majority’s conclusion that the vestiges of segregation have been eliminated with respect to the following areas: intra-district student racial balance, Majority at 761-762; special education student assignment, id. at 762-763; faculty and clerical staff assignment, id. at 766-768; extracurricular activities, id. at 768; transportation, id. at 769; *782 facilities, id.; in-service training, id. at 770-771; reading skills, id. at 771-772; curriculum, id. at 772-773; counseling and guidance, id. at 773-774; human relations, id. at 774; and discipline, id. at 774-776.
However, I cannot agree with the Majority that the Appellees demonstrated, or that the district court correctly concluded, that the vestiges of segregation have been eliminated with respect to the following facets of school operations: student classroom assignment; certified staff assignment; and communications skills programs. I therefore would remand to the district court for further findings regarding these three areas. In addition, because classroom assignment affects student achievement, I would remand for further findings regarding the so-called “areas of concern.” Finally, because the district court did not apply the correct legal standard regarding the exclusion of the testimony of one of the Coalition’s experts, I would remand for further findings on this issue as well.
A. Student classroom assignment
I note, first of all, that “the school districts acknowledge bearing the evidentiary burden” of proving compliance with this issue, other Green factors and the 1978 Order. See Majority at 776.
1. The district court’s findings and conclusions
Findings 30 to 49 of the district court’s opinion concern student classroom assignments. Coalition, 901 F.Supp. at 799-801. Findings 34 through 49 focus more specifically on “tracking” or “ability grouping,” i.e., the assignment of students “to various instructional groups on the basis of ability.” Id. at 800-01. Among the court’s findings are the following:
36. The extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record.
38. In 1993, the percentage of minorities in the self-contained honors and gifted student program at Burnett Elementary School [the only self-contained “gifted” student program in the 4 districts, id. at 800 n. 27], who scored above 85% on exams is slightly greater than that for the other groups.
5¡í i¡: H: # ‡ #
46. A review of the percentages of the racial groups who were taking college and non-college prep classes illustrates that: a) a little over 50% of Brandywine’s black students in grades 9-12 were taking non-college prep English, whereas a little less than 20% of Brandywine’s white students were taking that level of English; b) a little over 60% of Christiana’s black students in grades 9-12 were taking non-college prep English, whereas a little less than 25% of Christiana’s white students were taking that level of English; c) a little over 50% of Colonial’s black students in grades 9-12 were taking non-college prep English, whereas a little less than 35% of Colonial’s white students were taking that level of English; d) a little over 40% of Red Clay’s black students in grades 9-12 were taking non-college prep English, whereas a little less than 17% of Red Clay’s white students were taking that level of English. Less than 5% of black students were enrolled in advanced English in the high schools of the 4 districts; however, over 20% of white students were at that level.
47. There is evidence that among high school students who achieve identical testing scores [“The comparison apparently does not include academic achievement as measured by course performance, or whether such placement was requested or required.” Id. at 801 n. 30.], black students were more likely to be placed in the lower level class than were white students.
48. On the other hand, the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts.
49. There is evidence that lower levels of instruction may not encourage achieve *783 ment and may adversely affect the ability of a student to attend college.
Id. at 800-01 (citations omitted).
Taken together, these findings demonstrate that: (1) African-American students are less likely to be assigned to high-level classes than their white counterparts, and more likely to be placed in low-level classes [¶ 46]; and (2) these disparate assignments are made at least in part for reasons' other than academic merit, since black students who perform as well as white students are “more likely to be placed on the lower level class than [are] white students” [¶ 47; see also ¶¶ 38, 48]. In the absence of alternative explanations, these findings permit the inference that the four districts’ tracking practices may be based, at least in part, on racial considerations. Furthermore, the court’s findings demonstrate that these disparate tracking assignments may deprive African-American students of the opportunity to achieve the same level of academic success, including college admission, as their white counterparts [¶ 49].
The district court made no additional finding of fact regarding alternate explanations for these “potentially troubling” findings, see Majority at 763. Furthermore, whereas it was able to conclude, with regard to school-based student assignments, that “[t]he 4 districts are among the most racially balanced schools in the United States,” see Coalition, 901 F.Supp. at 799, ¶ 29, it reached no such conclusion regarding tracking-based assignments.
The court did conclude as a legal matter that “there is no credible evidence linking any current racially identifiable conditions to the prior violation,” id. at 823, and that “the vestiges of past discrimination have been eliminated to the extent practicable.” Id. at 823-24. I believe that the evidence discussed supra does not support this conclusion.
First of all, the court’s own findings constitute “credible evidence” potentially linking one racially identifiable condition — i.e., the racial disparities in assignment to high-level and low-level classes — to “the prior violation.”
Second, while the findings regarding student tracking do not prove conclusively that the school districts discriminate in then-tracking practices on the basis of race, they certainly do not support the opposite conclusion — i.e., that the districts do not discriminate on the basis of race. If anything, the court’s findings create a presumption that race might be a factor in New Castle County’s tracking practices. Since the burden with regard to the Green factors — including student assignments — is on the Appellees to prove that the vestiges of segregation have been eliminated, and since the Appellees offered no explanation for the disparities in tracking, the- uncertainty as to the cause of the disparities should be resolved in favor of the Coalition, ■ and therefore the district court’s conclusion that the vestiges have been eliminated, at least with regards to student classroom assignment, was unsupported and premature.
2. The Majority’s analysis
Despite the disparity between the court’s own findings of fact and its conclusions of law, the Majority affirms the court’s conclusion. I believe that the Majority’s position is based on the wrong standard of review, the wrong allocation of burdens and an unsustainable reading of the evidentiary record.
(a)
■ First, the Majority defines “our task” as “to inquire whether the district court’s determination of the districts’ unitary status was clearly erroneous.” Majority at 764. The district court’s determination as to unitary status, however, is one not of fact, which we would review for clear error, but of law, see Coalition, 901 F.Supp. at 822-23, which as is customary we subject to plenary review.
(b)
Second, time and again the Majority dismisses the import of the district court’s factual findings by resolving gaps in the evi-dentiary record and ambiguities as to those factual findings in favpr of the Appellees, despite the fact that by its own acknowledgment, and that of Appellees, Appellees bear *784 the burden of showing that the vestiges of discrimination have been eliminated.
(i) The Majority dismisses the district court’s finding that “among high school students who achieve identical testing scores, black students were more likely to be placed in the lower level class than were white students,” Coalition, 901 F.Supp. at 801, ¶ 47, as “no[ ] ... evidence that black students have not received equal opportunity.” Majority at 763. While the Majority concedes that this “potentially troubling” finding might “suggest[ ] on its face that black students may have been segregated from white students of equal testing aptitude,” id. at 763, it rejects this conclusion on the ground that the comparison did not “consider[] as well the important factor of academic achievement based on course performance,” and that “it is not clear whether the placement at issue was requested or required.” Id. at 763.
Of course, the evidentiary gaps that the Majority identifies do not nullify the import of the district court’s finding as to potential disparate treatment of equally qualified students based on race. Furthermore, these gaps should not serve to exonerate the party that bears the burden of proof; uncertainty as to the significance of the district court’s factual finding should not be resolved in favor of the party that bears the burden.
(ii) The Majority dismisses the district court’s finding that “the percentage of minorities enrolled in honors and AP classes who scored over the 75th percentile in reading or math in the spring of 1993 is slightly greater than that of whites in all 4 school districts,” Coalition, 901 F.Supp. at 801, ¶48, as “so limited, and thus malleable, a sample,” Majority at 764, as to allow any number of inferences. Specifically, while the Majority acknowledges that “this finding could ... give rise to an inference that blacks must perform at a higher level than whites in order to be placed in honors and AP classes,” it suggests that “we may just as reasonably infer something quite different: that the school districts’ good faith efforts to desegregate have paid off in terms of the improved testing performance of black students.” Id. at 764.
The Majority’s inference, even assuming that it is one an appellate court could draw, is unconvincing at best: the issue is not whether some black students perform well, but rather whether black students must perform better than whites to be placed in honors and AP classes, which the district court’s finding clearly suggests. In any case, once again it is inappropriate — and legally erroneous — to dismiss the Coalition’s interpretation because another interpretation, more favorable to Appellees, is possible when the burden lies with Appellees.
(iii) The Majority dismisses the district court’s finding that “[t]he extent to which elementary and middle school students are placed in classes according to their ability is unclear from the record,” Coalition, 901 F.Supp. at 800, ¶ 36, as “mean[ing] little on its own, for it represents merely that there is uncertainty in the record about how elementary and middle school students are placed in classes according to their ability.” Majority at 764.
True enough. However, uncertainty about student placement merely demonstrates that Appellees have failed to meet their burden of showing that the vestiges of discrimination have been eliminated. To suggest otherwise is to misallocate the evidentiary burden.
(iv) The Majority dismisses the district court’s finding of “[ejvidence that lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college,” Coalition, 901 F.Supp. at 801, ¶49, as “not establishing] anything specific about whether that putative problem is related to disparate educational opportunity or treatment according to race.” Majority at 765.
The significance of this finding, however, is not to demonstrate that black students are channeled to lower-level classes, but that if they are, this would have a deleterious effect on their level of academic achievement. This finding, when read in the context of the district court’s other findings suggesting that students are assigned to different levels of instruction based on race, is ominous and suggests that the poor performance of black *785 students in a number of areas might not be related solely to socioeconomic factors.
(c)
At the end of its analysis, the Majority proclaims that “[a]s we already have made clear, [the basis on which students are placed in lower levels of instruction] was not racially discriminatory.” Majority at 765. In fact, neither the district court’s findings nor even the Majority’s analysis supports such a conclusion. At best, they suggest that the record is indeterminate regarding whether students are assigned to certain levels of instruction on the basis of race — i.e., that Appellees have failed to establish that in the area of student assignment, the vestiges of discrimination have been eliminated to the extent practicable.
3. Conclusion
For the foregoing reasons, I would remand to the district court for further findings regarding the racial disparities in tracking.

B.Certified staff

Regarding the issue of staff assignment, the district court noted that “[t]he staff is divided into three subsections: administrative staff, certified staff, and classified staff.” Coalition, 901 F.Supp. at 802, ¶ 50. As the court explained, “‘[certified staff includes nonadministrative certified personnel such as teachers, psychologists, speech and hearing therapists, educational diagnosticians and other ‘instructional and pupil support personnel.’” Id., ¶ 52.
Except for teachers, the court made no finding regarding the racial identifiability of the schools with respect to the certified staff.[2] Similarly, the Majority discusses the districts’ efforts regarding the faculties, Majority at 767, and the “non-professional” or “classified” staff only, id. at 767-768, but in no way discusses the districts’ efforts regarding certified staff.
No one disputes that these professionals were included in the 1978 Order, and I see no reason for the district court’s omission. Therefore, I would remand to the court for further findings regarding whether vestiges with regard to certified staff have been eliminated.

C.Communication skills

The 1978 Order required the districts (which at the time were consolidated into a single district) “to institute an affirmative reading and communication skills program which does not resegregate pupils.” Evans, 447 F.Supp. at 1015-16. I do not dispute the Majority’s conclusion that “the districts ... met the standard of good faith compliance with” the Order regarding reading skills. See Majority at 771. However, the district court made not a single finding regarding the implementation of a communication skills program. See Coalition, 901 F.Supp. at 809-10, ¶¶ 168-185.
The Majority contends that this oversight is inconsequential because “there is no meaningful distinction between reading skills programs and communication skills programs,” Majority at 772, and that “‘reading skills’ and ‘communications skills’ are synonymous for purposes of our analysis here.” Id. at 772. However, there is no support in the record to read the “communication skills” requirement as mere surplusage. I cannot agree with the Majority’s suggestion, eighteen years after the fact, that the language of the 1978 Order was merely sloppy or redundant. This suggestion is not only in contradiction with the careful analysis of the district court at the time, but also with the plain meaning of the words. Reading and communication are different forms of human activity, and they involve different skills. Therefore, I would remand to the district court for further findings in this area.

D.Areas of concern

In addition to the so-called Green factors and the ancillary relief measures outlined by the district court in 1978, the district court considered several “areas of concern” for possible discriminatory practices: student *786 achievement; special education; and dropout rates. Coalition, 901 F.Supp. at 818-22. As the Majority acknowledges, there is no dispute that significant disparities along racial lines remain in these various areas. See Majority at 776. The issue is whether these disparities are legally cognizable vestiges of de jure segregation. The district court concluded that “[tjhere is no credible evidence demonstrating that the differences between black and white children’s success in school can be attributed to the former de jure segregated school system.” Coalition, 901 F.Supp. at 828.
In a very real sense, there can be no doubt that the condition of many African-Americans in our society is a lasting legacy of a time when people of color as a matter of law were denied equality of opportunity. However, the Supreme Court has made it clear that not all vestiges of de jure segregation are “the concern of the law,” but only those that “have a causal link to the de jure violation being remedied.” Freeman v. Pitts, 503 U.S. 467, 496, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992).
With regard to the Green factors, causality is presumed. As the Majority explains, “the Green factors have become per se vestiges of de jure segregation.” Majority at 776. Causality is also presumed for the ancillary relief measures contained in the 1978 Order. But the issue of establishing causality is a more difficult one in the case of the identified performance disparities.
I agree with the Majority that under the typical scenario, “[bjecause the performance disparities claimed by Appellant are not among (or even similar to) the Green factors or the vestiges identified in the 1978 Order, we will not simply presume ... that these are vestiges of de jure segregation.” Majority at 776-777. I also agree with the Majority, however, that if the district court ultimately were to find that the school district has not achieved unitary status, the burden would shift and the plaintiffs would be entitled to a presumption of causality. See id. at 777 (citing Vaughns by Vaughns v. Bd. of Educ. of Prince George’s County, 758 F.2d 983, 990-91 (4th Cir.1985)).
As I explain supra, I believe that remand is appropriate in the instant matter for further findings regarding classroom assignment. If the district court were to conclude on remand that students are assigned to different levels of education based on race, under Vaughns by Vaughns such a finding would create a presumption of causal relationship between the de jure violation and the disparities in achievement, and the evi-dentiary burden would shift to Appellees. We note, too, that this presumption would be entirely consistent with the district court’s own finding that “lower levels of instruction may not encourage achievement and may adversely affect the ability of a student to attend college.” Coalition, 901 F.Supp. at 801, ¶ 49.
Because any conclusion the court draws regarding class placement may affect its conclusion that “[tjhere is no credible evidence demonstrating that the differences between black and white children’s success in school can be attributed to the former de jure segregated school system,” id. at 823, I would vacate the court’s conclusion regarding the so-called areas of concern and remand for reconsideration in light of the above.
E. Exclusion of Jan de Leeuw’s testimony
The Coalition argued on appeal that the district court improperly excluded expert testimony it sought to present to rebut the defendant’ own experts, and that it was prejudiced by the exclusion. The Majority correctly notes that “[a] trial judge’s exclusion of testimony cannot be disturbed on appeal ‘absent a clear abuse of discretion.’ ” Majority at 775 (citing Semper v. Santos, 845 F.2d 1233, 1238 (3d Cir.1988); Fashauer v. New Jersey Transit Rail Operations, 57 F.3d 1269, 1287 (3d Cir.1995)). However, review is plenary when the district court’s evidentia-ry ruling “implicates ‘the application of a legally set standard.’ ” Lippay v. Christos, 996 F.2d 1490, 1496 (3d Cir.1993) (quoting Savarese v. Agriss, 883 F.2d 1194, 1200 (3d Cir.1989)).
1. Factual findings
On November 2, 1994, the district court issued an order setting up, inter alia, the *787 framework for pre-trial discovery. In particular, the court ordered that by November 9, 1994, “each party [should] designate which of its experts [would] testify at trial and the specific subject matter as to which each expert [would] testify.” Coalition to Save Our Children v. Delaware Board of Education, Nos. 1816-1822-SLR, slip op. at 4 (D.Del. Nov. 2, 1994) (Order) (JA 318). The court further ordered the parties to “exchange expert reports, the content of which will comply with Fed.R.Civ.P. 26(a)(2)(B)” by November 23. Id., slip op. at 5 (JA 319).[3]
The Coalition submitted its list of experts on November 17. Among those listed was Dr. Jan de Leeuw, Director of the UCLA Statistical Consulting Center. Redesignation of Expert Witnesses, Coalition to Save Our Children v. State Board of Education, C.A. No. 1816-1822 SLR, slip op. at 2 (D.Del. Nov. 17, 1994) (JA 346). Dr. de Leeuw was to “be called as an expert witness in the fields of statistical consultation, data analysis, and related matters.” Id.[4]
Dr. de Leeuw submitted his Report on Creation and Use of Database (hereinafter the “de Leeuw Report”) on November 29, 1994. JA 4041. The report deals exclusively with the preparation and construction of the database. One section, entitled “Goal of Analysis,” explains:
The analysis consists of providing expert witnesses with tables. The tables depicted the racial composition of districts and schools with regard to outcomes of interest. These tables provide the actual number and percentages of students who fall within each of these categories. In addition, the tables include marginal (or conditional) percentages.
de Leeuw Report at 14 (JA 4055).
An attorney for the school system wrote to the court on December 1 protesting that “the expert reports provided by Plaintiff were incomplete,” Letter from Rodman Ward, Jr. to Judge Sue L. Robinson (Dec. 1, 1994) (JA 362), and asking that the Coalition provide “expert reports that comply .fully with Rule 26(a)(2)(B)” by December 9. Id.; see also Letter from Rodman Ward, Jr. to Thomas D. Barr (Dec. 2, 1995) (JA 384). The Coalition apparently did not supplement Dr. de Leeuw’s report by that date. Board’s Brief at 55.
Dr. de Leeuw was deposed on December 15. After being initially asked if he would be “offering any opinions in this matter,” he responded, “Opinions, no. I have to describe the database construction, and I don’t think that involves any opinions.” Deposition of Jan de Leeuw, Dec. 15, 1994 (hereinafter the “de Leeuw Deposition”) (JA 1562). However, Thomas Henderson, a counsel for the Coalition,[5] intervened later during the deposition to “give [the Board’s counsel] notice that [Dr. de Leeuw] may testify as to materials and analyses, data ... in the defendants [sic] reports.” Id. (JA 1563). Describing this intervention as “a real problem,” Andre G. Bouchard, the school system’s counsel, requested that he be given notice if the Coalition intended to call Dr. de Leeuw to testify about “anything outside of his report.” Id. Mr. Henderson responded, ‘Well, I heard your request and it’s on the record, and I will consider that.” Id.
*788 The same day, the Coalition informed the defendants of its intention to call three new rebuttal experts. One of these witnesses was Dr. Franklin Fisher, a professor of economics at M.I.T., who was to testify on the statistical analysis methods used in the reports by Dr. Rossell, Dr. Armor and Dr. Walberg, three of the Board’s witnesses. JA 858. The defense objected during a hearing held on December 27, on the ground that Dr. Fisher’s testimony would simply “duplicate what [it] thought Mr. Deleeuw [sic] was supposed to do.” JA 860. The next day, the court sustained the objection and excluded the new experts’ testimony:
The deadline for naming experts is long past. The general context of defendants’ experts’ testimony and methodology used by these experts should have been of no surprise to the plaintiff. Defendants would be prejudiced if these experts were allowed to testify. And plaintiff has not claimed prejudice in the absence of their testimony.
Tr. 1572 (JA 863). The Coalition did not appeal the court’s ruling.
On January 3, 1995, the day of Dr. de Leeuw’s testimony, the Coalition’s counsel handed to the defendants what defendants describe as “91 pages of charts and statistical data,” Board’s Brief at 56, and signaled that it intended to call Dr. de Leeuw to offer rebuttal testimony regarding the analyses of three experts for the defendants, Drs. Armor, Achilles and Reschly. Boards’ Brief at 56. The new testimony sought from Dr. de Leeuw was to be the same as that which the Coalition expected to elicit from Dr. Fisher, and that the court excluded on December 28. JA 1229. This time again, however, the court excluded the testimony on the ground that the Coalition’s effort failed to comply with the court’s previous orders and with Rule 26.
2. Legal analysis
The Coalition argues that the court’s exclusion of Dr. de Leeuw’s rebuttal testimony is contrary to Rule 703 of the Federal Rules of Evidence, as well as “normal practice and the common usage of expert witnesses.” Appellant’s Brief at 47. The Coalition further argues that exclusion of Dr. de Leeuw’s testimony “does not make sense since Dr. de Leeuw’s testimony was fashioned, and could only have been fashioned, after the cross-examination of the School System’s witnesses and the production of data bases and disk files that were made during trial.” Id. at 47-48. Finally, the Coalition argues that the excluded testimony “would have demonstrated a series of methodological and analytical flaws fatally undermining [the Coalition’s] testimony.” Id. at 47. Because the district court failed to consider the importance of Dr. de Leeuw’s proffered testimony, I would remand.
(a)
I note, first, that Rule 703 of the Federal Rules of Evidence is inapposite to the dispute at hand. Rule 703 states, inter alia: “The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.” The subject of the dispute over Dr. de Leeuw’s testimony, and the reason for his exclusion, is the scope of his expertise as defined in the Coalition’s November 30 report, and more specifically “whether at this late stage in the proceeding the plaintiff should be given the opportunity to present affirmative evidence by an expert never before qualified in” the area of student achievement. JA 1230 (statement by the Court).
Similarly, the cases cited by the Coalition as evidencing “normal practice and the common usage of expert witnesses” are of no relevance in the instant case. The issue in the first two cases was whether an expert should be allowed to testify after attending the testimony of other witnesses, allegedly in violation of an order by the court excluding all witnesses from the courtroom during trial. United States v. Crabtree, 979 F.2d 1261, 1270 (7th Cir.1992), cert. denied, 510 U.S. 878, 114 S.Ct. 216, 126 L.Ed.2d 173 (1993); United States v. Bramlet, 820 F.2d 851, 855 (7th Cir.), cert. denied, 484 U.S. 861, 108 S.Ct. 175, 98 L.Ed.2d 129 (1987). Nor does the third ease cited by the Coalition, an unreported district court opinion, offer any support for its argument. Laysears v. *789 Schindler Elevator Corp., No. Civ. A. 94-3152, 1995 WL 568480 (E.D.Penn. Sept. 27, 1995).
(b)
The Coalition next argues that Dr. de Leeuw’s testimony could only have been fashioned after cross-examination of the Board’s witnesses and the production of databases and disk files during trial. There are two problems with this argument. The first is that regardless of when specific data was given to the Coalition, the Coalition was aware all along that the school system would present statistical analyses as part of its argument, and it was aware by late November of the areas for which statistical analysis would be presented. The second problem has to do with the chronology of what information was available and when. As just noted, as of November 30, the Coalition knew the subjects on which the school system’s various experts would testify, and the extent to which they relied on statistical analysis. JA 1289. As to specific experts, “anything that Dr. Achilles relied on in his testimony was entirely in the appendix to the report on the 30th in terms of all the backup data for his tables.” JA 1290. Regarding Dr. Reschly’s testimony, “the backup tables for all of that data [the data on which Dr. Reschly relied] were all contained in the appendix that [the school system] delivered on November 30th.” Id. Finally, as to Dr. Armor, it appears from the school system’s uncontro-verted testimony that “[h]is methodology is described in his report. The statistical analysis is described in his report. The assumptions that he made in his regression methodology is described carefully and fully in his report.” Id. Therefore, the only data that was missing as of December 1 was specific census data used by Dr. Armor in his work— but again, while the Coalition may not have had all the data as of November 30, it knew the scope and methodology of the testimony to be presented by the school system. Therefore, the district court was certainly acting within its discretion when it found that the Coalition failed to comply with its orders regarding Dr. de Leeuw’s belated testimony.
(c)
Our analysis does not end with the district court’s finding, however. It has been the “consistent position” of the Third Circuit that “ ‘the importance of the excluded testimony is one of the factors to be considered in deciding whether the trial court abused its discretion in excluding a witness.’ ” Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 302 (3d Cir.1991) (quoting Meyers v. Pennypack Woods Home Ownership Assn., 559 F.2d 894, 904 (3d Cir.1977), overruled on other grounds, Goodman v. Lukens Steel, 777 F.2d 113 (3d Cir.1985), aff'd, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)).[6] Other factors include: “bad faith on the part of the party seeking to call witnesses not listed in his pretrial memorandum,” Meyers, 559 F.2d at 904; “ability of the party to have discovered the witnesses earlier,” id.; “validity of the excuse offered by the party,” id.; “willfulness of the party’s failure to comply with the court’s order,” id.; and “the parties’ intent to confuse or mislead his [sic] adversary.” Id.. As the court in Meyers explained, the following “basic considerations” should guide the court’s decision:
(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the ease or of other eases in the court, and (4) bad faith or *790 willfulness in failing to comply with the court’s order.
Id. at 904-05; see also DeMarines v. ELM Royal Dutch Airlines, 580 F.2d 1193, 1201-02 (3d Cir.1978).
Furthermore, “the likelihood of finding an abuse of discretion is affected by the importance of the district court’s decision to the outcome of the ease and the effect it will have on important rights.” In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 750 (3d Cir.1994) (citation omitted), cert. denied sub nom. General Electric Co. v. Ingram, — U.S. -, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995).
There is no evidence in the record that the district court considered the importance of Dr. de Leeuw’s proffered testimony or several of the other factors outlined in Meyers. Therefore, I believe that we should vacate the district court’s decision to exclude Dr. de Leeuw’s belated testimony and remand to the district court for the more complete consideration of Dr. de Leeuw’s testimony that the law of this Circuit demands.
III. Conclusion
The presence of a number of young black students at the argument of this matter should serve as a compelling reminder to us that while we struggle over the sufficiency of proof and allocation of burdens, our decision today directly affects the education and future of many of these young people.
As I cannot join the opinion of the Majority on the legal grounds outlined above, neither can I join the condemnation of Coalition’s counsel. Without the zealous advocacy demonstrated throughout this case’s history, much of what has been accomplished in the past two decades would not have been.
Nor can I join in the Majority’s criticism of “the micromanagement of [segregated] school systems by the federal courts.” Majority at 779. The courts assumed their role in these matters not out of an unquenchable thirst for power or a desire to intrude upon the province of others, but because of the failure of those charged with the responsibility of ending segregation to fulfill the duties imposed upon them and respond voluntarily to the commands of Brown. The courts’ authority in these matters does not spring from arrogance, nor does it merely “inhere in equity jurisdiction.” Id. It is rooted in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
Much time has elapsed since the State of Delaware was first ordered to desegregate its schools and, admittedly, much has been accomplished. But unless and until we can be certain that all of the vestiges of past discrimination have been eliminated to the extent practicable, supervision should not be abandoned. Considering that we are dealing here with the education and future of a large number of tomorrow’s leaders, to trade additional time for greater equality is not a bad bargain.
Accordingly, I would remand for further consideration and findings consistent with this opinion.

. Dan T. Carter, The Politics of Rage: George Wallace, The Origins of the New Conservatism, and the Transformation of American Politics 149 (1996).

. The sole exception is in Christiana, which "monitors the racial percentage of such staff continuously.” Coalition 1995, 901 F.Supp. at 802, ¶ 62.

.Rule 26(a)(2)(B) states, inter alia:
Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions....

. The Board defendants argue in their brief that the expert list identified Dr. de Leeuw as "its expert to prove the accuracy of its statistical presentation.” Boards' Brief at 55. This characterization is nowhere contained in the expert list or in Plaintiff's Proposed List of Deponents dated October 27, 1994 (JA 305).

. The transcript erroneously identifies the Coalition's counsel at the deposition as Thomas D. Barr. In the course of the trial, Mr. Henderson rectified the record. See JA 1229.

. None of the cases cited by the Majority suggest otherwise. In Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269 (3d Cir.1995), the district court excluded previously undisclosed rebuttal expert testimony after noting, "I'm making the judgment that [Dr. Ehrenreich’s testimony] is so laughably ludicrous that I don’t think you need — that it requires rebuttal." Id. at 1287. (Dr. Ehrenreich is the person whose testimony the “surprise witness" was designed to rebut.)
In Semper, the court found that "it is questionable whether the rebuttal testimony would have materially helped Semper.... [B]oth the trial judge and the Appellate Division of the District Court discounted the significance of [the] proposed testimony." Semper, 845 F.2d at 1238. The court further described the excluded testimony as "hardly 'strik[ing] at the heart' of Semper’s case.” Id.